Jaeger Motor Car Company, a Wisconsin Corporation v. Commissioner. Anna Jaeger v. Commissioner. Anthony A. Jaeger v. Commissioner. Anthony A. Jaeger and Anna Jaeger v. Commissioner. Jaeger Motor Car Company, a Wisconsin Corporation v. Commissioner.
Jaeger Motor Car Co. v. Commissioner
Docket Nos. 56974, 57409, 57410, 66520, 66522. 1958-223.
United States Tax Court
T.C. Memo 1958-223; 1958 Tax Ct. Memo LEXIS 7; 17 T.C.M. (CCH) 1098; T.C.M. (RIA) 58223; December 31, 1958
*7 1. Jaeger Motor Car Company (JMC) was engaged in the new and used car business. During 1945 through 1948 over-invoice payments on cars sold by JMC were diverted from the company to Anthony Jaeger, president and controlling stockholder of JMC. Respondent determined the over-invoice payments diverted from JMC to be income to both Anthony and JMC. Respondent computed the amount of the over-invoice payments by the net worth method. Held: Respondent's determination sustained, with certain adjustments to his net worth computation. 2. During 1946 through 1948 profits on cars sold by JMC were retained by members of Anthony's family other than Anthony. JMC did not report these profits as income. Held: These profits are income to JMC. 3. Held: A portion of the deficiencies in respect to each of the petitioners for each of the years 1945 to 1948, inclusive, was due to fraud with intent to evade tax. 4. Held: JMC and Anthony filed false or fraudulent returns with intent to evade tax for the year 1945. Consequently the statute of limitations is no bar to the assessment of the deficiencies for that year. 5. During 1947 through 1951 JMC paid for certain improvements to property owned by Anthony *8 which JMC leased from him. Held: The improvements constituted dividend income to Anthony and Anna Jaeger. 6. The reasonable compensation for services rendered JMC by various members of the Jaeger family and deductible by JMC is established. 7. Jaeger Finance Company (JFC) accrued interest payable to Anthony and Anna in 1948 and 1949. The interest was paid in 1950 and reported by Anthony and Anna as income in 1950. Respondent, on the constructive receipt theory, determined the interest to be income to Anthony and Anna in the years accrued payable rather than in the year paid. Held: Respondent's determination sustained. 8. Insurance commissions paid pursuant to an agency agreement between Anthony and Motors Insurance Corporation were orally assigned by Anthony to JFC and JMC. Held: The commissions are income to Anthony. Moke Epstein, Inc., 29 T.C. 1005, followed. 9. Additions to tax under section 294(d)(2), Internal Revenue Code of 1939, sustained. 10. Respondent's determination that an excessive refund was paid pursuant to JMC's filing an "Application for Tentative Carry-Back Adjustment" sustained. Carl R. Becker, Esq., 208 E. Wisconsin Avenue, Milwaukee, Wis., for the petitioners. *9 Thomas J. Donnelly, Jr., Esq., and James T. Wilkes, Jr., Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: These consolidated proceedings involve deficiencies and additions to tax as determined by respondent in his deficiency notices in the following amounts: Additions to Tax
Petitioner
Year
Income Tax
Sec. 293(b)
Sec. 294(d)(2)
Jaeger Motor Car Company
1945
$ 8,593.51 * *10 $ 4,296.75
Doc. No. 56974
1946
11,466.99
5,733.49
1947
15,812.01
7,906.00
1948
20,634.88
10,317.44
1949
17,163.64
1950
12,506.82
Anthony A. and Anna Jaeger
1948
$10,361.40
$ 5,180.70
$623.96
Doc. No. 57409
1949
3,287.26
425.05
1950
79.10
Anthony A. Jaeger
1945
$ 6,758.50
$ 3,379.25
Doc. No. 57410
1946
13,551.92
6,775.96
$819.56
1947
14,764.14
7,382.07
Anthony A. and Anna Jaeger
1951
$ 2,366.81
Doc. No. 66520
1952
724.55
1953
460.48
Jaeger Motor Car Company
1951
$23,672.96
Doc. No. 66522
1952
16,119.41
1953
15,236.35 The issues for decision are as follows: 1. Whether Anthony A. Jaeger diverted over-invoice payments on cars sold by Jaeger Motor Car Company to his personal use and failed to report them as income during the years 1945 to 1948, inclusive, as determined by respondent's net worth computation, and whether Jaeger Motor Car Company realized and failed to report income from over-invoice payments on sales of automobiles during the years 1945 to 1948, inclusive. 2. Whether Jaeger Motor Car Company failed to report income for the years 1946 to 1948, inclusive, from sales of automobiles where the profits was retained by various members of Anthony's family. 3. Whether, as to Jaeger Motor Car Company for the years 1945 to 1948, inclusive, Anthony A. Jaeger for the years 1945 to 1947, inclusive, and Anthony A. and Anna Jaeger for the year 1948, a part of the deficiency for each of the years is due to fraud with intent to evade *11 tax. 4. Whether Jaeger Motor Car Company and Anthony A. Jaeger filed false or fraudulent returns with intent to evade tax for the year 1945, thereby making the statute of limitations no bar to the assessment and collection of deficiencies for 1945. 5. Whether Anthony A. Jaeger for the year 1947, and Anthony A. and Anna Jaeger for the years 1948 to 1951, inclusive, received taxable dividend income from Jaeger Motor Car Company as a result of the Company paying for certain improvements to land owned by Anthony. 6. If the improvements made by Jaeger Motor Car Company are not dividend income to Anthony, at what rate may they be depreciated by the Company. 7. Whether the compensation paid by Jaeger Motor Car Company to Edna Jaeger in the years 1945 to 1953, inclusive, Wilma Petrie in the years 1946 to 1953, inclusive, Clara Petrie (Kilbourn) in the years 1950 to 1953, inclusive, and Anthony A. Jaeger in the years 1949 to 1953, inclusive, was reasonable in amount. 8. Whether interest due from Jaeger Finance Company to Anthony A. and Anna Jaeger was constructively received and taxable to them in the years 1948 and 1949, when accrued, or in 1950 when paid. 9. Whether commissions received in *12 the years 1945 through 1947 by Jaeger Motor Car Company and Jaeger Finance Company on an insurance agency contract in the name of Anthony A. Jaeger are taxable to Anthony or the companies. 10. Whether additions to tax under section 294(d)(2), Internal Revenue Code of 1939, are applicable to Anthony A. Jaeger for the year 1946 and to Anthony A. and Anna Jaeger for the years 1948 and 1949. 11. Whether Jaeger Motor Car Company is entitled to a net operating loss carry-back from 1954 to 1952. Other issues have been settled by stipulation. Findings of Fact General Facts Some of the fact are stipulated and the stipulation of facts with the attached exhibits are included herein by this reference. During the years in issue Anthony A. Jaeger and Anna Jaeger were husband and wife residing in Wauwatosa, Wisconsin. Anthony filed individual income tax returns with the collector of internal revenue for the district of Wisconsin for the calendar years 1945, 1946 and 1947. He and his wife filed joint income tax returns with the collector of internal revenue for the district of Wisconsin for the calendar years 1948 through 1953. Jaeger Motor Car Co. (hereinafter sometimes referred to as JMC) is a *13 Wisconsin corporation organized in 1934. JMC filed income tax returns with the collector of internal revenue for the district of Wisconsin for the calendar years 1945 through 1953. Anna is involved herein, having filed joint returns with Anthony in the years 1948 through 1953. Accordingly, all references to Anna apply only to such years. Anthony went to Milwaukee in 1910 at the age of 17 and worked as a mechanic until 1917, when he entered the automobile repair business with his brother. Shortly thereafter he bought out his brother and continued the business as a sole proprietorship until 1921. Anthony also bought and sold used cars during these years and at one time had approximately $10,000 in inventories. In 1921 Anthony sold his business and took a job as a car salesman. He worked as a salesman until 1926 when he received a Pontiac franchise from General Motors Corporation. He opened a Pontiac dealership in Milwaukee in 1926 and operated as a sole proprietorship until 1934, at which time he organized JMC to take over the business. JMC was controlled by its president, Anthony. The stockholdings of the corporation at all times in issue prior to December 31, 1947 were as follows: Anthony A. Jaeger
203 shares
Anna Jaeger
31 shares
Clara Petrie (Kilbourn)
6 shares
Wilma Petrie
5 shares
Edna Jaeger
5 shares
Total
250 shares
On *14 and after December 31, 1947, the stockholdings of JMC were as follows: Anthony A. Jaeger
812 shares
Anna Jaeger
124 shares
Clara Petrie (Kilbourn)
24 shares
Wilma Petrie
20 shares
Edna Jaeger
20 shares
Total
1,000 shares
Clara Kilbourn, Wilma Petrie, and Edna Jaeger are all daughters of Anthony and Anna. Harold Petrie, deceased, was the husband of Clara, and Harry Petrie is the husband of Wilma. Unreported Income and Fraud The accounting system maintained by JMC was the system recommended by General Motors and involved the usual books of entry and records utilized in a mercantile business. The books and records were maintained by a full-time bookkeeper and an office staff. During the years in issue Clara prepared a substantial portion of the sales invoices. The invoices were prepared from copies of salesmen's orders. The amounts shown on the invoices were then posted by the bookkeeper to the books of the company. As will be noted in detail infra there were numerous discrepancies between amounts shown on the salesmen's orders and the invoices. If a transaction was not properly recorded on the invoice it would not be properly recorded on the books of the company. Thus an over-invoice payment would *15 not be recorded on JMC's books. Anthony's and JMC's income tax returns were prepared by Roblee, a certified public accountant, from information supplied by the company's books and prior tax returns. Over-invoice payments, not being recorded on JMC's books, were not reported as income by the company. Anthony maintained no personal records of his income. A personal account was maintained on the books of the company for Anthony and each of his daughters. In the deficiency notices respondent determined by net worth computation that Anthony and the company had unreported income from over-invoice payments on car sales in the following amounts: 1945
$10,115.14
1946
20,252.98
1947
20,090.56
1948
18,476.33 Minor changes in the above figures were made by respondent in the amendments to his answers. Most of the items in respondent's net worth computation have been stipulated. The facts in relation to items in respondent's net worth computation that are disputed by petitioners are as follows: Cash on Hand. When Anthony opened his Pontiac dealership in 1926 his net worth was about $12,000 and he used substantially all of his cash to finance the enterprise. Shortly thereafter he closed his personal checking *16 and savings account. Between 1928 and May 11, 1943, Anthony and Anna had no personal savings account. Between 1928 and December 19, 1946, Anthony and Anna had no personal checking account. Between November 23, 1926 and December 4, 1934, Anthony as a sole proprietorship maintained a checking account under the name of Jaeger Motor Car Company. On July 10, 1934, JMC opened a checking account and has maintained the account since that time. In its early years Anthony's business was in a week cash position. Bank overdrafts occurred frequently. During JMC's early years Anthony had outstanding loans in the following amounts: 1936
$27,847.16
1937
40,980.97
1938
30,480.97
1939
25,180.97
1940
30,430.97
1941
8,900.00
1942
5,900.00 The loans were repaid by JMC and charged to Anthony's personal account. During 1936 and 1937, when JMC was in great need of money, Anthony placed all the cash he could obtain in the business. He had no cash accumulation at the end of 1936. Substantially all monies borrowed by Anthony were placed in the business. From 1937 through 1944 Anthony's major source of income was his company salary and rental income from his real estate holdings. Anthony's rental income and salary were credited *17 to his personal account on the company's books. His Federal and state taxes, substantial amounts of his personal living expenses, with the exception of food, entertainment and other miscellaneous items, were paid by company check and charged to his personal account. Anthony's rental income came primarily from the company which leased its property from him. His major sources of cash from 1937 through 1944 were approximately $16,500 in company checks issued payable to Anthony or to cash, and approximately $1,700 in checks payable to Anna and charged to Anthony's account. In 1943 Anthony and Anna opened a saving account and in 1943 and 1944 deposited $2,638.18. During 1945 and 1946, when the sales price of automobiles was regulated by OPA, sales would be recorded on the invoices and the books of the company at OPA ceiling prices. At times an additional cash payment often amounting to 20 per cent of the invoice price was paid by the purchaser. This cash, after a small portion was deducted for the salesman's commission, was turned over to Anthony. Anthony set the sale price on the cars and thereby determined the over-invoice payment. The money Anthony placed in his safety deposit box in *18 1946 was composed entirely of over-invoice cash payments never recorded on JMC's books. JMC was fined $850 in 1945 for violation of OPA regulations. The Emergency Price Control Act of January 1942, as it pertained to automobiles, was in effect from 1942 through July 1, 1946. It was again made effective August 1, 1946, and continued to November 19, 1946, when it was discontinued. Wilma and Clara were both on JMC's payroll. Wilma's earnings from 1931 through 1941 totaled approximately $4,745.73. Clara had the following amounts of cash available to her from her earnings during 1941 through 1946: 1941
$1,158.80
1942
4,831.22
1943
2,530.60
1944
2,325.36
1945
2,579.47
1946
2,810.58
Agents examined Anthony's personal safe on June 7, 1949, and found that it contained $3,053 and miscellaneous items. Anthony had cash on hand as of December 31, 1944 through 1948 as follows: December 31, 1944
$ 500
December 31, 1945
500
December 31, 1946
2,500
December 31, 1947
3,000
December 31, 1948
3,000
Cash in the Safety Deposit Box. On January 2, 1946, Anthony opened a safety deposit box at Northern Bank, Milwaukee, Wisconsin. The only recorded entries to the box were on January 2, 1946, December 18, 1946, and December 19, 1948. *19 Anthony placed war bonds and one or more deeds in the safety deposit box when he opened it on January 2, 1946. He placed $11,400 in the box and removed a deed from it on December 18, 1946. The $11,400 was money received by Anthony as overinvoice cash payments from used car dealers on sales of automobiles to them. On December 19, 1948, Anthony removed the war bonds and any remaining deeds from the safety deposit box. On May 27, 1949, agents opened the safety deposit box and found that it contained $11,400 in cash. Anthony had $11,400 cash in his safety deposit box on December 31 of each of the years 1946 through 1948. Real Estate. Anthony had real estate and improvements on North 27th Street on December 31 of each of the years 1944 through 1948, as follows: Reserve for
Year
Cost
Depreciation
1944
$76,500.80
$16,803.40
1945
76,500.80
18,566.15
1946
76,500.80
20,328.90
1947
74,000.80
21,911.65
1948
74,000.80
23,614.40
Personal Expenses Paid by JMC Check. Anthony's personal expenses paid by JMC check and charged to his account on JMC's books during 1945 through 1948 were as follows: 1945
$2,582.04
1946
3,391.79
1947
2,796.94
1948
3,458.85
Personal Expenses Paid by Cash. During 1945 through 1948 Anthony withdrew *20 the following amounts of cash from his personal account with JMC: 1945
$5,413.13
1946
3,179.00
1947
5,936.40
1948
4,659.62
Anthony's additional personal expenses paid by cash during 1945 through 1948 were as follows: 1945
$3,175.31
1946
3,679.24
1947
3,925.02
1948
3,957.14
Trip to Florida. Respondent determined that Anthony spent $907.25 on a trip to Florida in 1948 and added this amount to Anthony's nondeductible personal expenditures in computing his income by the net worth method. The only record of the cost of the trip is a charge to Anthony's personal account on JMC's books for $99.30. Discrepancies Between Invoice Price and Sale Price. The following is a list of specific instances where the amount paid for a car exceeded the invoice price: Date
Purchaser
Payment Over Invoice Price
6/ 6/46-11/ 5/46
Ernst
18 sales - $ 25-
500 on each sale
9/30/46-11/ 1/46
Hirschman
16 sales - 200-
300 on each sale
9/30/46
Dobbert
approx.
600 on each sale
10/14/46
Forsythe
approx.
700 on each sale
11/ 7/46
Eberl
5 sales -
1,800
11/ 8/46
Damon (for Dobbert)
approx.
600
12/ 9/46
Dobbert
approx.
600
3/ 1/47
Januszewski
600
3/ 5/47
Newman (for Stemper)
650
3/24/47
Wusso
1942 Pontiac
4/18/47
Reak
450 and 1938 Ford
5/ 7/47
Schwab (for Dobbert)
approx.
600
9/19/47
Dedrick
400
10/17/47
Dombeck
400
10/24/47
Schlaser
250
1947
Olson
2 sales - 40-
50 on each sale
1/ 8/48
Schlaser
50
8/31/48
Dettmann
1937 Chevrolet
*21 The above cars were part of JMC's inventory and sold on the company's premises by Anthony or other salesmen. Conclusion. Anthony's net income for 1945 through 1948 was as follows: 1945
$29,049.46
1946
52,926.66
1947
50,551.88
1948
51,115.89
Anthony, Anna, and JMC reported the following amounts of net income on their income tax returns for 1945 through 1948: Anthony
Year
and Anna
JMC
1945
$20,237.74
$ 12,048.32
1946
30,199.29
103,715.80
1947
28,107.76
268,393.48
1948
36,673.39
204,231.50
Anthony and Anna failed to report interest and dividends in the following amounts: 1945
$ 49.72
1946
103.36
1947
331.60
1948
557.43
Anthony, Anna, and JMC failed to report income from over-invoice receipts from car sales in the following amounts: *
1945
$ 8,762.00
1946
22,624.01
1947
22,112.52
1948
13,885.07
A portion of the deficiencies in respect to Anthony, Anna and the company for each of the years 1945 through 1948 was due to fraud with intent to evade tax. Statute of Limitations The notice of deficiency in respect to 1945 taxes was mailed to *22 JMC on December 29, 1954, and to Anthony on January 18, 1955. No consents extending the period of assessment were filed for the calendar year 1945. Anthony and JMC filed false or fraudulent returns for 1945 with intent to evade tax. Family Car Sales and Sales Where the Profit Was Retained by Various Members of the Jaeger Family During 1946 through 1948 many cars were billed out to various members of Anthony's family for the purpose of showing a low inventory of cars on hand, in order to prevent General Motors from cutting JMC's new car allotment. When a car was billed out to a member of the family, that person's personal account on JMC's books would be charged. The family member never paid for the car, but his or her personal account would be credited to reflect payment when the car was sold to the ultimate purchaser. Once cars were removed from the company's books, any subsequent profit on their sale was retained by the family and not reported by JMC. Respondent determined that in 15 transactions during 1946 through 1948 profits on sales of automobiles were diverted from JMC and retained by various members of Anthony's family. The transactions were as follows: Additional
Date of
Ultimate
Date of
Additional
Profit Re-
Invoiced to
Invoice
Purchaser
Purchase
Profit
tained by
Dr. Robb Smith
7-17-46
Dr. Robb Smith
7-17-46
$ 882.49
Harold R. Petrie
Thomas R. Moore
7-25-46
Thomas R. Moore
7-25-46
300.00
Harry E. Petrie
Harry E. Petrie
12- 6-46
John G. Sonnenberg
12-17-46
795.00
Harry E. Petrie
Edna Jaeger
12- 1-46
James Cuthbertson
12-11-46
1,000.00
Edna Jaeger
Edna Jaeger
12-20-46
1947
1,000.00
Edna Jaeger
Wilma Petrie
7-2-47
Walter Yokeum
8- 4-47
775.00
Wilma Petrie
Mrs. Anthony A. Jaeger
8-25-47
Earl Fieldhack
8-21-47
585.34
Harry E. Petrie
Not recorded, received
Grant C. Schwartz
8-29-47
775.00
Harry E. Petrie
as trade-in on Field-
hack sale
Harry E. Petrie
10- 6-47
1947
200.00
Harry E. Petrie
Harold Petrie
4- 1-47
4- 1-47
700.00
Harold Petrie
Harold Petrie
7-22-47
Steve Weininger
11- 1-47
1,000.00
Harold Petrie
Edna Jaeger
8-25-47
James Morano
4-26-48
1,046.05
Edna Jaeger
Harold Petrie
11-10-47
Elmer Klock
1-21-48
550.00
Harold Petrie
Clara J. Petrie
11-29-47
Morley L. Morgan
6-14-48
1,195.15
Harold Petrie
Joy Brockman
12-21-48
Francis Van Rommen
12-18-48
600.00
Harold Petrie
Total urreported company profit on sales retained by members
of A. A. Jaeger family
$10,804.03
*23 The cars were sold by Anthony or JMC salesmen on the company's premises to purchasers who had come to buy cars from the company. In as least one instance a company warranty was given on the car sold. JMC failed to report income from sales of cars where the profit was retained by various members of the family as follows: 1946
$2,377.49
1947
5,035.34
1948
3,391.20
Improvements to Anthony's Property by JMC During and prior to the years in issue Anthony owned the properties on North 27th Street leased by JMC. On December 31, 1936, Anthony entered into a lease agreement with JMC for the rental of 1823 North 27th Street. The lease was for a term of one year with a total rent of $6,000 payable $500 per month, the company agreeing to pay all real estate taxes and insurance, and "to keep the premises in as good repairs as the same are in at the commencement of said term, reasonable use and wearing thereof and damage by accidental fire or other accidents not happening through neglect of the lessee * * * excepted." On December 31, 1937, the board of directors of JMC authorized the officers to enter into a lease with Anthony for the rental of 1823 North 27th Street at $250 per month for 1938, other *24 terms of the lease being the same as in the prior year's lease. No formal lease was executed between Anthony and the company, but the company continued to occupy the premises. JMC paid Anthony $250 per month throughout 1938 and 1939. In late 1939 Anthony built a 60 by 55 foot addition to the building occupied by the company. The addition was paid for by company check and charged to Anthony's personal account on the company's books. On May 6, 1940, the board of directors of JMC authorized the officers to enter into a lease agreement with Anthony for 1940, at $250 per month for January through March, and at $500 per month for the remainder of the year, plus all taxes and insurance premiums accruing against the property. Again no formal lease was executed between Anthony and the company, but JMC paid Anthony the rent authorized by the board of directors. JMC continued to pay Anthony $500 per month rent and pay all taxes and insurance premiums pertaining to the property throughout the early 1940's and all the years here in issue, even though no written lease was executed in any of these years. Following World War II the company's business began to expand rapidly. Car sales increased from *25 approximately $308,000 in 1945 to $832,000 in 1946, and to $1,634,000 in 1947. The number of cars sold increased from 194 in 1945 to 828 in 1947. In the course of its rapid business growth JMC outgrew its facilities. Pontiac division of General Motors objected to the cramped conditions on the company's premises and recommended that it expand its facilities. To aggravate matters, alley repairs by the city weakened the footings of one building and rendered it unsafe. JMC requested that Anthony take steps to improve the facilities rented by it. By this time the properties rented by the company from Anthony had increased to the point where they included 1823-27 and 1835-49 North 27th Street. In December 1946 a builder, Lupinski, Inc., was employed to correct the foundation weakness and to add a second floor to the main building. Lupinski agreed to make the desired building additions and alterations for $8,892. As the work progressed on the alteration and expansion program initiated by Anthony, bills were submitted to JMC by Lupinski and others. Bills totaling $16,867.56 were paid by company check and charged to Anthony's personal account on the books of the company. On May 6, 1947, the *26 board of directors of JMC held a meeting. A portion of the minutes of that meeting follows: "The President then informed the Directors that the remodeling of the first floor of a part of the building of the Company and the addition of a second story over the same portion was now completed and in use by the Company. He suggested that since these expenditures were requested of him by the Company in order to centralize business, and since said Company was in a better position to assume the liabilities for such now, that said Company take over said liabilities and assume payment for such, in return for this Mr. Jaeger agreed not to increase the rent now paid to him by the Company for the occupancy of said building." The company had never declared a cash dividend in its entire history, up to and including the years in issue. The increased sales after the war led to greater profits, and a substantial amount of earned surplus began to accumulate on the company's books. The company's earned surplus, as reported on its income tax returns, was as follows: December 31, 1945
$ 44,341.53
December 31, 1946
108,017.47
December 31, 1947
198,758.19
December 31, 1948
326,123.91
December 31, 1949
394,283.99
December 31, 1950
514,576.08
December 31, 1951
555,491.35
*27 On September 18, 1947, Roblee, Anthony's certified public accountant, wrote a letter to Anthony concerning JMC's accumulation of surplus. He warned Anthony of the possibility of an assessment on the undistributed profits of the company under section 102, Internal Revenue Code of 1939. Portions of this letter follow: "The Treasury Department has indicated that it will examine returns very carefully, and unless at least 70% of your current earnings are used for current income taxes and for paying dividends, you may be subject to these special taxes in addition to the regular income taxes. To avoid this tax under Section 102, you must show conclusively that the reason 70% was not paid out was due to the fact that you needed the money in your business, either to make needed improvements or for expansion purposes. "Some manufacturing plants can easily do this if they are putting up large additions to their plant and are expanding their businesses and need the cash. But I do not think that you have much of a chance to prove that you need these excess earnings for your business for the reason that you can take care of all of your commitments fairly well out of your current income. * * *
"Now *28 here are some suggestions and recommendations we would like to make at this time: * * *
"3. Pay a cash dividend immediately of not less than $25,000 to the stockholders of record when paid. * * *" On November 30, 1947, an entry was made transferring the charges to Anthony's personal account for $16,867.56 of building expenses to a company account called "Leaseholds and Improvements." On the same day Harry Petrie requested the bookkeeper to make out dividend checks in the amount of $25,000, although the board of directors had not formally authorized the payment of any dividends. The checks were prepared and an appropriate entry recorded on the company's books. On December 8, 1947, the board of directors met to consider the question of declaring a cash dividend. A portion of the minutes of that meeting follows: * * *
"Mr. Jaeger then explained that since the new second story added to the building had been made a Company 'Leasehold improvement,' the liability for payment thereof had transferred to said Company; therefore, the amount of this liability which had already been expended and charged to his personal account should be credited to his and assumed by the Company. However, as to *29 the balance, there was a controversy with the Contractor [Lupinski], the settlement of which efforts were being made to obtain. To secure this obligation, pending settlement, it was suggested that the amount claimed by the Contractor be earmarked for payment, set aside for such purpose and the books adjusted when a definite figure was arrived at. * * *
"Whereupon the following resolution was proposed: "RESOLVED: that the amount of $10,867.56 be transferred on the Books from Mr. Jaeger's personal account to that of the Jaeger Motor Car Co., and that the amount of $10,075.52 be withdrawn from Company Funds and 'earmarked' for payment of the Contractor's claim when correctly ascertained. *
"This resolution was duly seconded and unanimously passed. "As a further consideration to arriving at an amount of Dividend to be paid, Mr. Jaeger *30 explained he had made certain commitments, in his capacity as Pres., for a building program of expansion required by the Business. On these demand could be made at any time because arrangements were almost complete for the beginning thereof. As a result funds would have to be available when needed. These funds were shown to approximate the following figures: "1. $40,000.00 for remodeling So. part of old Bldg. 2. $40,000.00 for completion of 2nd story. 3. $20,000.00 for enlargement of Show Room. "These first two figures were arrived at from bids received from the Stock Const. Co. and the Bentley Const. Co. The latter was an architectural estimate. "These expenditures were a 'must' because the South Wing was deteriorating with age and the footings were inadequate. The expanded building had exceeded the limits of the old heating plant for adequate heating, and a new one being required, the boiler room was inadequate. Working conditions were very poor in the South Wing, and the old Show Room was fast becoming an 'eyesore.'" "Since this remodeling was necessary and more space for a rapidly expanding business was in demand, it was practical and economical to prepare the old building for *31 more than one story while at it, and go about completing the program for same begun in 1946. "The expanding office space required to handle the increased business was reducing the size of the Show Room, and Parts needed more space for display and waiting on customers. Thus, expansion of the North Wing was required to keep up with the times, and property therefor had already been purchased. "All Directors were in accord and agreed this building program was essential. "Whereupon, it was Resolved that these funds be 'earmarked' and set aside for the purposes aforementioned. "This resolution was duly seconded and unanimously adopted. "These amounts in total were compared with the entire amount of Company Funds, and a net figure arrived at. After allowing for approximate 1947 income taxes to be paid and keeping in mind that the Pontiac factory requires under its Franchise agreement with this Corporation keep a certain amount of 'working capital' - which in the instant case, considering the size of the Dealership, would be well over $100,000.00, there was not sufficient left out of which to pay a Cash Dividend to the Stockholders. It was decided that none be paid this year. "Whereupon, it *32 was resolved that the Jaeger Motor Car Company pay no Cash Dividend for the year 1947. "Said resolution was duly seconded and unanimously adopted." * * *
Harry Petrie wrote the minutes of the board of directors' meetings in 1947. Harry, although he was an attorney, did not practice law but worked as a salesman for JMC. During the remainder of 1947 and throughout 1948 to 1951, JMC paid for considerable improvements to the 27th Street properties owned by Anthony. The company paid for an addition to the main building which increased the show room, garage and office space. The addition also included several commercial offices which the company sublet at from $75 to $100 per month, each thereby being able to utilize the 27th Street properties at virtually no rental expense to itself. The capital improvements to Anthony's 27th Street properties paid for by the company amounted to the following: 1947
$26,131.92
1948
70,977.42
1949
43,976.29
1950
11,486.76
1951
2,095.00 The above improvements constituted dividend income to Anthony in the years in which they were made. Excessive Compensation for Personal Services Anthony, Clara, Wilma and Edna were all on JMC's payroll and received the following salaries *33 during 1945 through 1953: Year
Anthony
Clara
Wilma
Edna
1945
$16,000.00
$3,500.00
0
$2,470.00
1946
24,000.00
3,500.00
$ 500.00
2,720.00
1947
24,000.00
6,000.00
1,000.00
4,500.00
1948
30,000.00
5,200.00
1,000.00
5,200.00
1949
43,101.74
5,200.00
1,000.00
5,200.00
1950
47,955.26
8,200.00
1,000.00
6,700.00
1951
46,087.43
8,250.00
1,166.00
6,700.00 *
1952
43,787.13
6,150.00
1,164.50
5,350.00 *
1953
38,519.20
9,261.54
2,206.90
5,200.00 *
The company deducted the above amounts in computing its taxable income. Respondent determined a reasonable compensation for services rendered by Anthony to be $30,000 per year for 1949 through 1953, by Clara to be $5,200 per year for 1950 through 1953, by Edna to be $600 per year for 1945 through 1953, and by Wilma to be $166, $164.50 and $206.90 for 1951, 1952 and 1953, respectively. Respondent did not allow any compensation for services rendered by Wilma in *34 the years 1946 through 1950. Edna and Wilma both worked for JMC in their spare time, usually as fill-in for other members of the office staff who were absent from work. Their work was of a relatively simple nature, composed primarily of posting, cashiering and operating the switchboard. A reasonable compensation for the type of work done by Edna and Wilma was $1.00 to $1.50 per hour during the years in question. Wilma worked half days approximately eight to ten weeks a year. Until 1951 she did not receive any salary during the year, but received one large check at the end of the year. Edna worked a little more regularly than Wilma. When Edna worked she spent 15 to 20 hours a week in the office. However, Edna was a sickly girl and frequently did not work for periods of a month or more. The office manager did not maintain time cards to record the number of hours Edna and Wilma worked. Clara was secretary of JMC and played a substantial part in the operation of the business. During the years in question she maintained the new and used car inventory records, handled sales contests, did billing, recorded costs of used car conditioning and assisted in the general office work. In about 1949 *35 Clara's duties began to be of a more responsible nature. In addition to the duties she already had, she handled the ordering of new cars, priced new cars, took over Anthony's business correspondence, and handled customer complaints. In 1951 Clara started to do a substantial amount of the hiring and firing of company employees. In 1953 she started to do appraisal work. During the years in which respondent determined Anthony's salary to be excessive, Anthony's duties as president of JMC were diminishing. Although the business was growing and there was more work to be done, the major portion of Anthony's duties were delegated to others. As noted above, Clara took over Anthony's business correspondence, hiring and firing, car pricing and the handling of customer complaints. Harry Petrie was in complete charge of new car sales. Earl Getman was in complete charge of used car sales. Clem Droese handled the repair shop. Anthony virtually ceased to have any fixed duties, but acted more as a coordinator and overseer of the business operation. On October 5, 1948, the board of directors voted to increase Anthony's salary from $30,000 per year to $2,000 per month plus one per cent of the gross *36 sales of the company. From 1949 through 1953 Anthony's salary was $2,000 per month plus one per cent of gross sales. The company's gross profit before taxes as shown on its books was as follows for 1949 through 1953: 1949
$112,397.68
1950
200,614.25
1951
78,151.00
1952
46,186.00
1953
34,007.00
A reasonable compensation for the services rendered by Wilma was $250 per year for 1946 through 1953. A reasonable compensation for the services rendered by Edna was $600 per year for 1945 through 1953. A reasonable compensation for the services rendered by Clara was $6,200 in 1950, $7,200 in 1951, $6,150 in 1952, and $7,700 in 1953. A reasonable compensation for the services rendered by Anthony was $30,000 per year for 1949 through 1953. Interest Accrued Payable by the Jaeger Finance Company to Anthony and Anna Jaeger Finance Company, hereinafter referred to as JFC, commenced operations on May 1, 1946. The purpose of JFC apparently was to finance car sales to customers of JMC. JFC accrued interest payable on obligations to Anthony and Anna in the amounts of $1,461.39 and $2,492.50 in 1948 and 1949, respectively. The accrued interest was paid by JFC in June, 1950, and reported as income by Anthony and *37 Anna in 1950. Anthony and Anna reported their income on the cash basis. Respondent determined that interest in the amounts of $1,414.04 [1] and $2,492.50 was income to Anthony and Anna in the years accrued payable by JFC rather than in the year received by them. On April 30, 1948, JFC had current assets totaling $75,883.56, $50including cash and $75,193.64 accounts receivable. Current assets exceeded current liabilities, including notes payable to members of the Jaeger family, by $14,350.57. From May 1 to December 31, 1948, JFC had a profit from operations totaling $6,396.09. On April 30, 1949, JFC had current assets totaling $131,797.02, including $9,850.58 cash and $121,161.28 accounts receivable. Current assets exceeded current liabilities, including notes payable to members of the Jaeger family, by $22,910.04. From May 1 to December 31, 1949, JFC had a profit from operations totaling $9,249.98. Income from Insurance Commissions Assigned by Anthony to JMC and JFC On July 14, 1941, Anthony in *38 his individual capacity entered an agency agreement with MIC (Motors Insurance Corporation) whereby MIC agreed to pay Anthony a commission in all insurance business accepted from him. JMC and JFC were not parties to the agreement and were in no way mentioned therein. The agreement continued to be in effect throughout the years here involved. Pursuant to the agency agreement insurance policies were sold by various employees of JMC, but principally by Anthony. Anthony orally assigned his right to the insurance commissions to JMC and JFC. During 1945 through 1947 the companies received the following amounts of commissions: JMC
JFC
Total
1945
$707.61
0
$ 707.61
1946
563.37
$ 399.69
963.06
1947
741.30
1,884.02
2,625.32 Respondent determined that the above commissions were income to Anthony. JMC reported the receipt of the following amounts of commissions on its income tax returns: 1945
$707.61
1946
686.70
1947
840.69 Respondent determined that the above commissions were not income to JMC and excluded them from JMC's gross income. Anthony and the other employees of JMC did not sell insurance policies on behalf of the corporations. The insurance commissions were Anthony's personal income. Net Operating Loss *39 Carry-back JMC received a refund of $11,912.19 as a result of filing an "Application for Tentative Carry-back Adjustment" for a net operating loss carry-back from 1954 to 1952. Respondent determined that the correct refund should have been $434.34, and assessed JMC for repayment of the excessive refund pursuant to section 3780(c), Internal Revenue Code of 1939. Opinion Unreported Income as Determined by Net Worth Method Respondent determined by net worth computation that JMC realized and failed to report income from over-invoice payments on car sales during 1945 through 1948, and that Anthony diverted these over-invoice payments to his personal use and likewise failed to report them as income. Anthony contests respondent's use of the net worth method in computing income during the years in issue. He contends that since he made available to respondent complete details of each car sale during the years in issue, respondent had the duty to go forward with direct proof of the alleged discrepancy between reported income and actual income, and could not rely on the circumstantial evidence of the net worth method. Anthony relies on Thomas A. Talley, 20 T.C. 715 (1953), in support of his *40 position. Anthony's reliance on Talley is misplaced. There this Court stated that the books were sufficiently accurate and complete for the computation of income for all the years in question without relying on the net worth method. In the instant case neither the company nor Anthony maintained a record of over-invoice receipts. Furthermore, there is evidenced in this case a sufficient number of specific instances of discrepancies between the record and the realities of car sales to convince us of the inaccuracy of the books and records of the company. Under these circumstances there is no question that respondent is entitled to compute income by the net worth method. Holland v. United States, 348 U.S. 121 (1954); H. A. Hurley, 22 T.C. 1256, affd. 233 Fed. (2d) 177 (C.A. 6, 1956). Anthony contends that in his net worth computation respondent used incorrect figures for cash on hand, cash in the safety deposit box, real estate, and reserve for depreciation, expenses of a Florida trip, personal expenses paid by company check and charged to Anthony's account on the company's books, and additional personal expenses paid by cash. At various times Anthony has claimed to have had radically *41 different amounts of cash on hand as of December 31, 1944. At an informal conference in 1952 he stated that he had about $5,000. In his petition, he alleged that the amount of cash on hand was $51,000. In the course of the trial he testified that he had $35,000 cash on hand at that date. Anthony's demeanor on the stand and his evasive and often contradictory testimony have led us to believe that he is little concerned with this Court's obtaining a candid and accurate picture of the facts. Evidence presented at the trial convinced us that Anthony could not have had a cash accumulation of more than $500 on December 31, 1944. Frequent bank overdrafts and heavy borrowing indicate that Anthony had no cash accumulation in 1937. An examination of his cash resources reveals that he had approximately $18,000 in cash available during the years 1937 through 1944. Out of this amount he deposited approximately $2,600 in a savings account, leaving approximately $15,400 to pay his food bills and other personal expenses not paid by company checks. Under these circumstances, Anthony could not have accumulated a sizeable amount of cash. Anthony alleged that he had a source of cash other than checks *42 from the company, namely, loans from his daughters. Affidavits executed by Edna and Wilma were given to internal revenue agents. Edna's affidavit stated that she loaned Anthony $6,832.50 during 1941 through 1946. Anthony conceded at trial that none of this money contributed to his cash balance on December 31, 1944. Wilma's affidavit stated that she loaned Anthony $3,000 between 1931 and 1941. An analysis of the company's records reveals Wilma's earnings during that period to be approximately $4,745.73. It is highly questionable that Wilma had any money left to loan Anthony after her taxes and personal expenses. Furthermore, Wilma's demeanor on the witness stand renders her testimony and affidavit unworthy of belief. We are convinced that Anthony's alleged cash hoard could not have included any money from Wilma. Clara testified and a supporting affidavit was submitted in evidence to the effect that she loaned Anthony $1,850 in 1941, $1,800 in 1942, $1,800 in 1943, $1,800 in 1944, $2,300 in 1945, and $2,300 in 1946. She stated that upon accumulating $300 to $600 she would give the cash to her father. The amounts of cash available to Clara in those years are set forth in the Findings *43 of Fact. Considering Clara's testimony as outlined above and further testimony that her personal expenses were $1,200 a year, we find that Clara could not have loaned Anthony the amounts alleged during the years 1941, 1944, 1945, and 1946. We do not believe any funds from Clara contributed to Anthony's alleged cash hoard on December 31, 1944. There were no records kept by either Anthony or Clara relating to the amounts of loans alleged to have been made. There are no canceled checks reflecting transfers of money to Anthony. There is no evidence of any of the alleged loans having been repaid and Clara testified that none were repaid. Furthermore, in 1952 Anthony stated to agents that the $35,000 was composed of income from the company and rental income. No mention was made of loans from his daughters. Upon carefully reviewing all of the evidence before us we have concluded that no cash in the form of loans from the daughters was in Anthony's possession at the time immediately prior to and during the years in issue. In view of the facts that the agents found $3,053 in Anthony's safe in June 1949, and having considered Anthony's testimony that he had more cash in December 1948 than in *44 December 1944, and other evidence before us, we have concluded that Anthony had the amounts of cash on hand at various dates during and prior to the years in issue as noted in the Findings of Fact. Anthony's testimony in respect to his handling of cash in the safety deposit box is a mass of confusion and contradiction. He testified that he placed $25,000 in the safety deposit box in January 1946, that he deposited $16,000 to $18,000, representing over-invoice payments in 1946, that on December 18, 1946 he deposited $15,000 representing receipts from the sale of a building, and that on December 19, 1946 he withdrew $9,000 to $10,000 to give to Clara. This testimony is clearly contradicted by the record of entries into the box. At another point Anthony testified that he put $20,000 to $25,000 in the safety deposit box in January 1946 and put in $11,400 later in the year. At another point he testified that the $11,400 was included in the January deposit. At still another point he stated that he placed only a few thousand dollars in the box in January 1946 and placed $25,000 in the box in December 1946. Testimony of this nature is obviously valueless and it would serve no purpose to further *45 enumerate the discrepancies in Anthony's testimony on this point. Anthony did state at one point in his testimony that he accumulated the $11,400 from over-invoice payments on sales to two used car dealers. These particular sales occurred during 1946. Anthony further stated that he never touched this money after placing it in the safety deposit box. We feel this is the only credible portion of his testimony and we have adopted this testimony, together with other evidence, in the Findings of Fact to dispose of this question. Anthony has also questioned the figures used by respondent for the cost basis and depreciation reserves of properties owned by Anthony and located on North 27th Street. In his net worth computation respondent adopted the cost and depreciation figures used by Anthony in his income tax returns. With one minor exception these same figures were used by Anthony's certified public accountant in his preparation of a net worth statement. Anthony testified that correct figures were used in his income tax returns reflecting cost basis and allowance for depreciation on the properties in question. In view of this testimony we have accepted respondent's determination. Anthony *46 next contests respondent's determination that he expended $907.25 in 1948 on a vacation trip to Florida. Respondent added this amount to Anthony's nondeductible personal expenditures for 1948 in computing Anthony's income. On brief respondent contends the $907.25 is evidenced by checks drawn payable to the Coronada Hotel and charged to Anthony's personal account on the company's books. An examination of Anthony's personal account revealed only one check payable to the Coronada in the amount of $99.30. This amount is included in the figure reflecting personal expenses paid by the company and charged to Anthony's account on the company's books. The remainder of respondent's determination on this point is rejected. On brief respondent stated that he would accept Anthony's figures for personal expenses paid by the company. Anthony's figures for this expenditure have been adjusted to avoid duplication of stipulated expenses and adopted in the Findings of Fact. Respondent determined Anthony's additional personal expenses paid by cash to be $3,175.31, $3,679.24, $3,925.02 and $3,957.14 for 1945 through 1948, respectively. By an amendment to his answer he increased these amounts in 1946 and *47 1947 by $2,891.89 and $2,741.94 respectively. Anthony contends the additional personal expenses paid by cash amounted to a maximum of $1,800 per year for each of the years in issue. As noted in the Findings of Fact, Anthony withdrew sufficient amounts of cash from the company out of which the determined expenditures could have been made. Anthony testified that he gave Anna about $150 per month during the years in question. He also testified that in 1937 to 1945, years during which he was in a tight cash position, he spent an additional $200 a month himself. When asked if he spent about the same amount during the years in issue he answered, "I don't know offhand… Naturally if I had more money I spent more." He obviously had more money due to the receipt of over-invoice payments, discussed infra. Anthony's further testimony on this point is confusing and unreliable. It must also be noted that certain substantial segments of Anthony's personal expenses, such as food and entertainment, were not paid by company check, and had to be paid in cash. After a careful examination of the record, we are convinced that Anthony had additional personal expenses at least as large as respondent determined *48 in the notice of deficiency, and have incorporated these figures in the Findings of Fact. We cannot sustain respondent's determination in his amended answer, for he has not presented any evidence to carry the burden of proof imposed on him in respect to these items. Anthony also contends that the net worth computation does not include all the assets he had on December 31, 1944. He presented no evidence to buttress his contention. On the other hand respondent submitted in evidence two net worth computations, one made by an agent and one made by Anthony's CPA. The CPA testified that he had been preparing Anthony's and the company's returns since 1935. It would seem to follow that the CPA was reasonably familiar with Anthony's financial condition and his assets. The net worth computation submitted by the CPA contained the same assets and liabilities incorporated in the agent's net worth computation on which respondent's determination is based. We are satisfied that all Anthony's assets are reflected in respondent's net worth computation. Anthony finally contends respondent has failed to establish that the alleged unreported income was from over-invoice payments on cars sold by the company. *49 The parties have stipulated that "The alleged unreported income of Anthony A. Jaeger is solely as a result of alleged unreported profits on the sales of new and used automobiles by Jaeger Motor Car Company, which profit the said Anthony A. Jaeger allegedly diverted to his own uses and purposes during the years 1945 to 1948, inclusive." Anthony has failed to realize that in respect to the deficiencies the burden is upon him to show error in respondent's determination. Aside from contesting specific items in respondent's net worth computation, as discussed above, Anthony has not presented any credible evidence to convince this Court that the company was incapable of producing alleged unreported income. Indeed, the evidence is quite convincing that over-invoice payments on sales of cars by the company were a source of income to Anthony during the years in question. Several instances where sales price exceeded invoice price during 1946 through 1948 are noted in the Findings of Fact. It is worth noting that in at least 13 transactions over-invoice payments were accepted after the discontinuance of OPA regulations, thus discrediting Anthony's and others' testimony that over-invoice payments *50 were not accepted after price controls were eliminated. The over-invoice payments in these transactions were made on purchases of cars from the company's inventory. The cars were sold by company salesmen on the company's premises. Anthony and company salesmen testified that to avoid OPA regulations the invoices were made out at OPA ceiling prices, and cash payments accepted in excess of the ceiling prices. Anthony admitted receiving over-invoice payments in 1946. The company was fined $850 for violation of OPA regulations in 1945, presumably for selling cars over ceiling prices. Salesmen testified that they gave the over-invoice payments to Anthony. Amounts received in excess of invoice prices were not recorded on JMC's books nor reported as income by either Anthony or the company. After a careful examination of all the evidence before us we feel compelled to conclude that Anthony diverted over-invoice payments from car sales during 1945 through 1948 to his personal use. Respondent has designated the payments as ordinary income to Anthony and Anna. We think, however, that under the circumstances they should be taxed as dividend distributions. The formal declaration of a dividend by *51 the company is not necessary, nor must the distribution be proportionate to the stockholdings, in order for the payments to be classified as a dividend distribution. See Jack M. Chesbro, 21 T.C. 123, affd. 225 Fed. (2d) 674 (C.A. 2, 1955); Dawkins v. Commissioner, 238 Fed. (2d) 174 (C.A. 8, 1956); United Mercantile Agencies, Inc., 23 T.C. 1105, modified and remanded on other grounds sub nom Drybrough v. Commissioner, 238 Fed. (2d) 735 (C.A. 6, 1956). An examination of the company's earned surplus as reported on its income tax returns reveals a sufficient amount of surplus to require the inclusion of all the payments in Anthony's and Anna's income. In the absence of any evidence to the contrary, we hold that Anthony and Anna received and failed to report over-invoice payments in the form of dividend income in the amounts noted in the Findings of Fact. Under the circumstances outlined above it is obvious that the over-invoice payments were also income to the company. United Dressed Beef Company, 23 T.C. 879, even though the payments never went directly to the company. United States v. Joliet & C.R. Co., 315 U.S. 44 (1942). We therefore hold that the over-invoice payments diverted *52 from JMC are taxable as income to the company which it failed to report in the amounts noted in the Findings of Fact. Family Car Sales and Sales Where the Profit Was Retained by Various Members of the Jaeger Family Respondent contends that in 15 transactions during 1946 through 1948 various members of Anthony's family retained profits that should have been reported by JMC in its income tax returns. He argues that cars were billed out to members of the family to prevent profits on subsequent sales from being recorded on JMC's books. Petitioners argue that cars billed out to members of the family actually belonged to them and not to the company, and consequently the profits on subsequent sales of these cars were not attributable to the company. In respect to the 11 cars billed out to members of the family, petitioners have failed to present any credible evidence to satisfy us that the removal of cars from JMC's records actually reflected a bona fide sale of the cars to various family members. The following is an excerpt from an affidavit executed by Clara on February 6, 1953: "During 1946, 1947 and 1948 * * * many new and used cars were billed to various employees including myself, *53 for the purpose of showing a low inventory of cars on hand and to prevent the factory from cutting our allotment of new cars * * * Although in many instances the employees billed for the cars did actually drive them for varying periods, they never did own them or pay for them. Their accounts were credited, for the amount originally charged, at the time when the car was ultimately sold to some customer. No provision was made for returning these cars to stock at the time of the final actual sale. * * * The four used cars billed to our account in 1947 and 1948 were never owned by us, but were strictly bookkeeping transactions for inventory purposes. * * *" In some instances members of the family testified that they did not remember the cars they allegedly owned. The cars were sold by Anthony or JMC salesmen to purchasers who had come to buy cars from the company. Testimony of some of the purchasers indicated they purchased their cars on the company's premises and believed they were dealing with the company. James Cuthbertson testified that he received a 30-day warranty from the company on the car he purchased. The car sold to Grant Schwartz was received in trade by the company in the *54 Fieldhack transaction. Schwartz testified that he bought the car on JMC's premises, and was under the impression that he was buying from the company. It seems clear that the cars billed out to members of the family and the car received as a trade-in in the Fieldhack transaction were never actually owned by individual members of the family, but were all part of the company inventory when sold to the ultimate purchasers. These transactions were, as respondent contends, merely a device for preventing the profit from being shown on JMC's books. This conclusion is most candidly illustrated when we notice that in the Fieldhack transaction the car was billed out to a member of the family four days after it was actually sold, thereby concealing a $585.34 cash profit and the fact that a trade-in was received which ultimately was sold to Schwartz at a $775 profit. Under the circumstances as outlined above, the profit on these 11 sales is attributable to JMC, and should have been reported as income by it. Estate of Esther M. Stein, 25 T.C. 940; Miller-Smith Hosiery Mills, 22 T.C. 581. In respect to the Brockman transaction, Fischer's testimony and petitioners' exhibits were inconclusive. The *55 evidence presented has failed to convince us that Harold did not retain a company profit, as determined by respondent. In respect to the remainder of the transactions noted in the Findings of Fact, petitioners have failed to present any credible evidence to sustain their burden of proving the incorrectness of respondent's determination. We hold that JMC failed to report income from sales of cars where the profit was retained by various members of the family in the amounts and years noted in the Findings of Fact. It should be mentioned that for 1948 respondent has requested a finding of unreported income due to family retained profits in an amount $1,746.81 smaller than he determined in the deficiency notice. In the absence of any clarification of this difference, we have assumed he has conceded this amount. Fraud and Statute of Limitations Respondent determined that as to Anthony, Anna and JMC, a portion of the deficiencies for each of the years 1945 through 1948 was due to fraud with intent to evade tax. The burden of proof is on the respondent. Section 1112, Internal Revenue Code of 1939. It is axiomatic that respondent must prove fraud by clear and convincing evidence. M. Rea Gano, 19 B.T.A. 518. *56 In our opinion he has sustained his burden. Respondent's net worth computation, as adjusted by us, supra, reveals that Anthony and JMC failed to report amounts of income from over-invoice payments ranging from $8,762.00 to $22,624.01, and representing approximately 30% to 42% of Anthony's taxable net income. The unreported over-invoice payments represented 42% of JMC's net income in 1945 and decreased each year until they represented 6% of the company's net income in 1948. Although there may be minor discrepancies in the net worth computation, we are satisfied that it is substantially correct. Respondent, in sustaining his burden of proof, need not prove the exact amount of the deficiency attributable to fraud, but only that a part of the deficiency is attributable thereto. United States v. Chapman, 168 Fed. (2d) 997 (C.A. 7, 1948). The only components of the net worth computation contested by petitioners which are approximations are cash on hand, personal expenses paid by company check, and additional personal expenses paid by cash. We are convinced that the amounts adopted by us representing these items reasonably proximate their exact amounts, and that any variance which may exist *57 is too small to substantially affect unreported income as we have found it. As noted earlier, we are satisfied that Anthony had no more than $500 cash on hand on December 31, 1944, the beginning of the period in issue. Due to Anthony's testimony that he had more cash in 1948 than in 1944, and due to the fact that agents found $3,053 in Anthony's safe early in 1949, we feel confident that respondent's figures for cash on hand during each of the years in issue are substantially correct. The amounts we have adopted representing personal expenses paid by company check are the amounts propounded by Anthony and accepted by respondent. The amounts we have adopted representing personal expenses paid by cash range from only $1,300 to $2,100 in excess of what Anthony contends was expended in this respect and therefore any variance of our findings from the actual amounts expended by Anthony for living expenses would not be sufficient to materially alter the amount of unreported income. Cf. W. A. Shaw, 27 T.C. 561, affd. 252 Fed. (2d) 681. The repeated substantial understatements of income, as revealed by the net worth computation, are persuasive evidence of fraud. Holland v. United States, supra; *58 Rogers v. Commissioner, 111 Fed. (2d) 987 (C.A. 6, 1940). In addition, respondent has established that in at least 55 transactions during 1946 through 1948 involving 15 purchasers, cash or a car was accepted in excess of the invoice price. Respondent has further established that in at least 11 transactions during 1946 through 1948 cars were billed out to members of the family as a device for preventing the profit on the subsequent sale from being reported on the company's books. Anthony admitted receiving over-invoice payments in 1946. Anthony failed to report dividend and interest income during 1945 through 1948. JMC was fined $850 for violating OPA regulations in 1945. Company salesmen testified that it was customary in the industry to receive over-ceiling payments while OPA was in effect, that Anthony set the sales price on cars, and that they gave over-ceiling payments to Anthony. The over-ceiling payments were never recorded on the books of the company, and never reported by JMC or Anthony as income. Respondent has presented a sufficient amount of evidence, including a sufficient number of specific transactions involving concealment of JMC income to convince us that Anthony, *59 who was the principal stockholder of the company, and other officers and employees of the company were engaged in a consistent pattern of conduct from 1945 through 1948 to conceal company income. The finding of fraud on the part of JMC may be sustained for Anthony and the other officers and employees of JMC were acting in behalf of the company when concealing corporate income by accepting over OPA ceiling and over-invoice payments. Their actions are therefore imputable to the company. As noted supra, the over-invoice payments diverted by Anthony are income to the company. We can see no basis for petitioners' reference to L. E. Shunk Latex Products, Inc., 18 T.C. 940, which involved an allocation of income under section 45, Internal Revenue Code of 1939, and where no OPA violation was established. It is clear that there was a willful diversion of income from the books and returns of the company and a deliberate omission of this income from Anthony's and Anna's returns. At this point we might add that the hostility, evasiveness, convenient lapse of memory, and direct contradictions in testimony on the part of Anthony and other officers and employees of JMC who testified certainly tend *60 to corroborate respondent's fraud determination. After a careful examination of the entire record, including but not limited to the evidence noted above, we hold that a part of the deficiencies against each of the petitioners for each of the years in issue was due to fraud with intent to evade tax. See Jack M. Chesbro, supra; also Dawkins v. Commissioner, supra. It follows that Anthony and the company filed false or fraudulent returns for 1945, and that the deficiencies for that year are not barred by the statute of limitations. Section 276(a), Internal Revenue Code of 1939. Improvements to Anthony's Property by JMC Respondent determined that improvements made by JMC to the 27th Street properties owned by Anthony constituted dividend income to Anthony. Respondent points out that the company never paid a dividend in its entire history, and that the surplus accumulation was reaching the point where a section 102 assessment was likely. Respondent reasons that all petitioners were trying to do was to get Anthony's property improved and that the improvement costs which were really liabilities of Anthony's were assumed by JMC instead of the company declaring a cash dividend and allowing *61 Anthony to pay for them. He argues that the transactions in question obviously lacked bona fides for no lessee would make substantial improvements to property without having a longterm lease to protect his investment. Respondent concludes that the substance of the transactions should prevail over the form and the improvements should be considered dividend income to Anthony. Anthony argues that two construction programs are involved in this issue, one involving Lupinski and the alterations made in 1947, and a second involving the expansion program initiated by the company in late 1947, as outlined in the minutes of the Board of Directors meeting on December 8, 1947. Anthony points out that in th second program the plan was initiated by Anthony in his capacity as president of JMC, and approved by the Board of Directors before any liabilities were incurred. Anthony concludes that no question of an assumption of his personal liabilities by JMC is involved. Anthony also argues that the improvements cannot constitute dividend income to him because no benefit was conferred upon him. He contends there is no evidence that either he or JMC would ever terminate the lease, thereby returning possession *62 of the property with its attached improvements to him. He further contends that at no time was a dividend intended by the Company, nor was a dividend ever declared. Anthony finally argues that the transactions in question come within section 22(b)(11), Internal Revenue Code of 1939, [2] and that the improvements therefore did not result in taxable income to him. Anthony cites M. E. Blatt Co. v. United States, 305 U.S. 267 (1938), illustrating that where a lessee makes improvements to the lessor's property, the lessor realizes no taxable income because of the increased value of the property either when the improvements are made, or when the lease is terminated. Respondent has raised this issue in respect to the years 1947 through 1950 by affirmative *63 pleading, and the burden is therefore on him in respect to these years. Rules 32, Rules of Practice of the Tax Court of the United States. The burden is on petitioners for the year 1951. We have carefully evaluated the numberous arguments propounded by counsel for both parties and have likewise examined the facts with great care. It seems obvious to us that the improvements in question constituted dividend income to Anthony. We might initially state that the tax consequences of the improvements result not from the lessee-lessor relationship, but from the stockholder-corporation relationship. For this reason section 22(b)(11) is inapplicable and Anthony's reference to the Blatt case, which involved a question of rental income is inappropriate. It is well settled that the Court, when trying to determine the tax impact on a transaction between a closely held corporation and its controlling stockholder, may evaluate the realities or substance of the transaction, and is not bound by the form the transaction may take. The form the transaction assumes must, of course, be determined to be unreal or a sham before it may be ignored. Commissioner v. Court Holding Co., 324 U.S. 331 (1945); Higgins v. Smith, 308 U.S. 473 (1940). *64 The essential elements of this problem are that improvements were made by a corporation on property owned by its controlling stockholder. Although the corporation leased the property from the stockholder, apparently on a year to year basis, the lease agreement was terminable by either party giving 30 days notice at the end of any year. Section 234.07, Wisconsin Statutes, Annotated. Thus the stockholder had within his power the right to regain possession of his property with the attached improvements made by the corporation at virtually any time he pleased. Being more specific, an asset paid for by JMC was made available for Anthony to take at any time he may have chosen to do so. We cannot distinguish the substance of this action by JMC, from a situation where a corporation credits earnings to the account of a stockholder, the stockholder being able to draw against the account at his leisure; Leo G. Hadley, 6 B.T.A. 1031, affd. 36 Fed. (2d) 543; or from a situation where a dividend check is made available to a stockholder but he manages to avoid receiving it until the following year. Frank W. Kunze, 19 T.C. 29, affd. 203 Fed. (2d) 957 (C.A. 2, 1953). In both the Hadley and Kunze *65 cases, and numerous other cases with similar facts, this Court has held that where an amount of corporate earnings and profits is made available to a stockholder, it results in dividend income to the stockholder in the year made available to him, regardless of the fact that he may not have actually received the dividend in that year. It is well settled that a disbursement of corporate earnings and profits may constitute dividend income to stockholders, even though a dividend has not been formally declared and the disbursement is not proportionate to the holdings of the various stockholders. Louis H. Zipp, 28 T.C. 314, affd. 259 Fed. (2d) 119; Paramount-Richards Theatres v. Commissioner, 153 Fed. (2d) 602; William C. Baird, 25 T.C. 387. The fact that in the instant case we are concerned with building improvements instead of cash is irrelevant, for a dividend may be either in money or property. Section 115(a), Internal Revenue Code of 1939. It is evident that while Anthony was worried about a section 102 liability, he had no desire to have the company declare a cash dividend. It is also quite evident that the facilities leased by JMC were inadequate for its business but that Anthony *66 lacked the funds to expand them. The conclusion seems irresistible that Anthony had his controlled corporation assume the construction program which he had undertaken, in the hope that he could avoid realizing dividend income and also have the company avoid a Section 102 liability. Simply stated, Anthony had JMC pay for the improvements rather than declare a cash dividend, which he could have used to pay for the improvements himself. When we examine the facts in this posture and realize that no lessee would make $150,000 worth of leasehold improvements without being protected by a long-term lease, and that Anthony had within his power the right to regain possession of the improved property virtually at will, we feel compelled to conclude that the improvements paid for by JMC were dividend income to Anthony. The fact that he did not choose to derive any direct benefit from the improvements made by the company, either by terminating the lease agreement and regaining possession of the properties, or by increasing the rent, is irrelevant. Respondent's determination, at least in respect to the 1947 improvements, may be sustained on yet another basis. An examination of the minutes of the *67 Board of Directors meeting on May 6, 1947, reveals that Anthony personally undertook the first building program, which involved foundation alterations and the addition of a second floor. JMC had no obligation to make improvements to Anthony's property. The liabilities which he personally incurred in this program were assumed by JMC. Mention of JMC's assumption of Anthony's liabilities is made in the minutes of the May 6, 1947 and December 8, 1947 meetings of the Board of Directors. Petitioners contend that the minutes are ambiguous and that the liabilities were not assumed by JMC. The minutes were prepared by Harry, who had legal training. We believe that the minutes say exactly what they were intended to say. There is no question that the payment of a stockholder's personal expenses and liabilities by a corporation constitutes dividend income to the stockholder. F. G. Lamb, 14 B.T.A. 814; Louis Greenspon, 23 T.C. 138, reversed on other grounds 229 Fed. (2d) 947 (C.A. 8, 1956). Wall v. United States, 164 Fed. (2d) 462, Ferro v. Commissioner, 242 Fed. (2d) 838. For the above-stated reasons, we hold that the improvements made by JMC in the years and amounts stated in the Findings *68 of Fact constituted dividend income to Anthony. The parties have agreed that if the Court found the improvements to be dividend income to Anthony, that Anthony and not JMC is entitled to depreciate the improvements at 3% per annum. Since we have so found, the depreciation question has been eliminated. Excessive Compensation for Personal Services Section 23(a)(1)(A), Internal Revenue Code of 1939, provides for the deduction from gross income of all ordinary and necessary business expenses, including a reasonable compensation for personal services rendered. Respondent has determined that certain portions of the salaries paid to Anthony, Clara, Wilma, and Edna were excessive, and he disallowed JMC's deductions of these amounts. Petitioners contend that the salaries paid to Anthony and Clara were reasonable in amount. Petitioners concede that the salaries paid to Edna and Wilma were excessive, but argue that reasonable salaries for Edna and Wilma are in excess of the amounts determined by respondent.
What constitutes a reasonable compensation for services rendered is a fact question which can be resolved only by a careful examination of the circumstances surrounding the payment of the *69 salaries in question. When the compensation question involves payments made by a family corporation to various members of the controlling family, the facts and circumstances surrounding the payments must be closely scrutinized. Kerrigan Iron Works, Inc., 17 T.C. 566; University Chevrolet Co., 16 T.C. 1452, affd. 199 Fed. (2d) 629 (C.A. 5, 1952). The burden is upon the petitioners to prove that a reasonable compensation for services rendered is in excess of the amounts allowed by respondent. The evidence is at best scanty in respect to the amount of work done by Wilma and Edna during the years in question. Respondent has determined that a reasonable compensation for Wilma was $166, $164.50, and $206.90 for 1951, 1952, and 1953, respectively. Respondent contends Wilma did not work during 1946 through 1950. It does appear, however, that Wilma worked half days for about 8 to 10 weeks during each of the years in question. Testimony of the company's office manager has convinced us that a reasonable compensation for Wilma's services was $1.00 to $1.50 per hour. We hold that $250 per year was a reasonable compensation for the personal services rendered by Wilma during 1946 through 1953. *70 Respondent has determined that a reasonable compensation for the services rendered by Edna was $600 per year for each of the years in question. It has been established that a reasonable compensation for the type of work done by Edna was $1.00 to $1.50 per hour. While we know that when Edna worked she spent 15 to 20 hours per week in the office, we do not know how many weeks a year she worked. No evidence was presented on this point. We are unable to determine or even approximate the number of hours Edna spent in the office each year, and consequently have no basis for ascertaining what a reasonable compensation would have been for Edna. Petitioners have failed to carry their burden of proof on this point. Accordingly, respondent's determination in respect to Edna's salary is sustained. Respondent has determined that a reasonable compensation for the services rendered by Clara during 1950 through 1953 was $5,200 per year. Clara received $5,200 per year in 1948 and 1949. Since 1949 Clara's duties and responsibilities as an employee of the company have steadily increased, and she has exercised an ever-increasing amount of control over the operation of the business. In the course of *71 her testimony Clara described herself as the "Business Manager" of the company. In our opinion Clara's assumption of added duties in 1949 through 1953 qualified her for a compensation in excess of what she was paid in 1948 and 1949. Although the added responsibilities warrant an increase in compensation, the increase cannot be disproportionate to the additional services rendered. Kerrigan Iron Works, supra.We hold that a reasonable compensation for the services rendered by Clara is $6,200 in 1950, $7,200 in 1951, $6,150 in 1952 and $7,700 in 1953. Respondent has determined that a reasonable compensation for the services rendered by Anthony to the company during 1949 through 1953 was $30,000 per year. Anthony's salary was $24,000 in 1946 and 1947 and $30,000 in 1948. Since 1948, although the business has been steadily growing, Anthony has taken an ever decreasing part in the operation of the business. Bit by bit his duties and control over the business operation were delegated to other members of the family and other employees. By 1949 Clara was ordering and pricing new cars, handling Anthony's business correspondence and handling customer complaints. Harry was in complete charge *72 of new car sales. Earl Getman was in complete charge of used car sales. Clem Droese handled the repair shop. Anthony no longer exercised a substantial supervision over the business after 1948, and in our opinion his service to the company was not deserving of any compensation in excess of the amount he was paid in 1948. We place no significance in the fact that the Board of Directors voted to increase Anthony's salary for 1949 and subsequent years, and to base it on a percentage of gross sales. It is obvious that no arms-length bargaining over salary was done between Anthony and the Board of Directors, which he controlled. The fact that a salary is based on a percentage of sales does not make the salary reasonable per se. We do not have the benefit of any expert testimony evaluating Anthony's services to the company, nor do we have the benefit of a clearly defined outline of Anthony's supervisory duties and responsibilities. We have examined Anthony's salary in the light of his contribution to the company. We have considered his salary in relation to the company's gross profit before taxes and in relation to Anthony's income in earlier years and in light of other factors we deem pertinent. *73 After a careful examination of the entire record, we see no basis on the facts before us to disturb respondent's determination that a reasonable compensation for Anthony's services was $30,000 per year for 1949 through 1953. Respondent's determination in respect to Anthony's salary is sustained. The company may deduct the amounts we have held to be reasonable compensation for services rendered by Anthony, Clara, Wilma, and Edna, pursuant to section 23(a)(1)(A). Interest Accrued Payable by the Jaeger Finance Company to Anthony and Anna Respondent determined that interest accrued payable to Anthony and Anna during 1948 and 1949 was constructively received by them and taxable to them in 1948 and 1949 rather than in 1950, when received. Respondent contends that JFC was a closely-held corporation under the control of the Jaeger family. He argues that JFC had sufficient funds from which Anthony and Anna could have taken their interest as it accrued during 1948 and 1949. Respondent, citing Albert J. Sullivan, 16 B.T.A. 1347, and Commissioner v. Arnold, 147 Fed. (2d) 23 (C.A. 1, 1945), concludes that under the circumstances as outlined above, the accrued interest is taxable to Anthony and *74 Anna as constructively received, in the years JFC could have paid the interest, rather than in the year JFC did pay it. Petitioners argue that the issue is not whether JFC had the ability to pay the interest as it accrued, but whether the decision not to pay it was predicated on sound business reasons. Petitioners, citing no cases to support their position, contend that the interest was not taxable to Anthony and Anna in the years accrued because, first, JFC did not have the ability to pay the interest as it accrued, and, second, sound business reasons for deferring payment justified JFC's not paying the interest as it accrued. Section 29.42-2, Regs. 111, entitled "Income Not Reduced to Possession," provides that: "Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must *75 be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. * * *" Respondent has submitted no evidence to establish that the interest was set apart for Anthony and Anna without any substantial limitation or condition upon which payment of the interest was to be made. Nor has respondent established that the receipt of the interest was within the control of Anthony and Anna, for he has presented no evidence to establish that JFC was a company controlled by the Jaeger family. Respondent's determination that the interest was constructively received by Anthony and Anna in the years it accrued must therefore stand or fall on its presumptive correctness. An examination of the evidence before us reveals that petitioners have presented no evidence to show cause for the accrued interest not being deemed constructively received by Anthony and Anna in the years accrued payable to them. The only evidence submitted by the parties was a copy of financial statements of JFC from May 1, 1946 through April 30, 1950, and testimony of Roblee, Anthony's *76 and JFC's CPA, that he did not include the interest in Anthony's and Anna's returns for 1948 and 1949 because "there was no evidence that that interest was available to Mr. Jaeger or paid to him for inclusion in his income." The financial statements reveal that JFC was a money-making operation, and that it had a sufficient amount of cash and readily liquidable current assets to pay the small amounts of accrued interest without jeopardizing its financial position. The financial statements clearly buttress respondent's determination rather than refute it. We have no evidence that JFC was unable to pay the interest or that "sound business reasons" opposed the payment of the interest as it accrued. In view of JFC's fairly stable financial position, and the lack of specific information concerning the availability of the accrued interest to Anthony and Anna, Roblee's bare statement, standing alone and unsupported by any other evidence, is insufficient to rebut respondent's determination. We need not pass upon the merits of petitioners arguments that a company's inability to pay accrued interest and the presence of "sound business reasons" for delaying payment of accrued interest are, as *77 a general rule, conditions under which the concept of constructive receipt will not be applied, for petitioners have not proved that either of these conditions are present in the instant case. Petitioners having failed to rebut the presumptive correctness of respondent's determination, respondent's determination is sustained. Income from Insurance Commissions Assigned by Anthony to JMC and JFC Respondent has determined that insurance commissions received by JMC and JFC were Anthony's personal income. Petitioners contend that Anthony assigned his interest in the insurance agreement to the companies, and that the commissions were not his personal income. The nub of this problem, simply stated, is whether Anthony was earning the insurance commissions for himself or for the companies. The law is well settled that when an individual transfers income earned in his own right to another, even though the transfer is made before the income is earned, the income is still taxable to him. Lucas v. Earl, 281 U.S. 111. Petitioners have presented no evidence to convince us that insurance policies were sold either by Anthony or other employees of JMC on behalf of anyone but Anthony. The agency agreement *78 was with Anthony as an individual. The agreement made no mention of either corporation. It is a violation of Wisconsin law for a corporation to act to an insurance agent. Section 209.04, Wisconsin Statutes, Annotated. The insurance policies were sold by Anthony and other employees of JMC. The facts in the instant case are substantially the same as the facts in Moke Epstein, Inc., 29 T.C. 1005. We see no reason to reach a decision in this case contrary to our decision in Moke Epstein, Inc. We therefore hold that the commissions received by JMC and JFC were income to Anthony personally, and includible in his gross income. See Moke Epstein, Inc., supra, and the cases therein cited. Section 294(d)(2). Additions to Tax Respondent determined additions to the taxes of Anthony and Anna for the years 1946, 1948, and 1949 for substantial underestimate of estimated tax. Petitioners presented no evidence or arguments on brief in relation to this issue. Accordingly, respondent's determination is sustained, subject to recomputation to reflect our holdings on the other issues herein involved. Net Operating Loss Carry-Back As a result of JMC filing an "Application for Tentative Carry-Back Adjustment" *79 for 1952, respondent refunded $11,912.19 to JMC. Respondent, upon examination of JMC's 1954 tax return, determined that JMC suffered a net operating loss of $835.27 in 1954 instead of $24,947.96. Respondent assessed JMC for a deficiency in the amount of the difference between the $11,912.19 refund and his determined correct refund of $434.34. No evidence has been presented on this issue. Respondent's determination is sustained. JMC seeks to offset its 1955 net operating loss against its 1953 tax liability. No issues have been raised by pleadings with respect to JMC's alleged 1955 net operating loss. Only issues raised by pleadings may be considered by this Court. Decisions will be entered under Rule 50. Footnotes
*. Includes declared value excess profits tax and excess profits tax. Jaeger Motor Car Company, by an amendment to its petition filed at the trial, in docket No. 66522, has raised an issue in respect to the allowable net operating loss carry-back from 1954 to 1952. Respondent, by amendments to his answer, seeks to make several adjustments to the above determined deficiencies and additions to tax. Most of the adjustments would result in increased deficiencies and additions to tax, and as to these adjustments the burden of proof is on respondent. The issues thus raised will be discussed in detail in the opinion.
*. Computed by subtracting Anthony's reported net income from net income shown by net worth computation, and subtracting unreported interest and dividends (conceded by Anthony) from the remainder.↩
*. The company 'earmarked' $10,075.52 for the payment of Anthony's disputed debt to Lupinski, and at the same time increased its Leaseholds and Improvements account a like amount. The company settled the debt on December 31, 1947, for less than the 'earmarked' amount. To reflect the settlement the company reduced its Leaseholds and Improvements account $3,575.52."↩
*. In his notice of deficiency respondent stated that Edna received the above salaries in 1951 through 1953. Although the evidence is inconclusive on this point, the dispute is not how much was in fact paid, but how much may be considered reasonable compensation for services. Accordingly we have adopted the amounts of salary used in the determination.↩
1. The reason for a difference between the $1,461.39 received and reported by Anthony and Anna in 1950, and the $1,414.04 determined by respondent to have been received by them is unexplained.↩
2. SEC. 22. GROSS INCOME. * * *
(b) Exclusions From Gross Income. - The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * *
(11) Improvements by lessee on lessor's property. - Income, other than rent, derived by a lessor of real property upon the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee.↩