First Security Bank of Utah, N.A., et al., [1] v. Commissioner. First Sec. Bank v. Commissioner
Docket Nos. 1190-63, 1191-63, 1216-63. .
United States Tax Court
T.C. Memo 1967-256; 1967 Tax Ct. Memo LEXIS 4; 26 T.C.M. (CCH) 1320; T.C.M. (RIA) 67256; December 27, 1967
Alonzo W. Watson, Jr., C. Preston Allen, Stephen H. Anderson, Suite 400, Deseret Bldg., 79 S. Main St., Salt Lake City, Utah, for the petitioners. James Booher, for the respondent. FAY
Memorandum Findings of *5 Fact and Opinion FAY, Judge: Respondent determined deficiencies in the petitioners' income taxes as follows: Docket
Taxable
No.
Petitioner
Year
Deficiency
1190-63
First Security Bank
1954
$ 68,250.00
of Utah, N. A.
1955
28,775.81
1956
54,526.56
1957
77,862.91
1958
159,371.46
1959
109,166.60
1191-63
First Security Com-
1956
95,997.48
pany
1957
126,400.83
1958
262,124.10
1959
179,550.34
1216-63
First Security Bank
1954
68,250.00
of Idaho, N.A.
1955
26,139.85
1957
160,392.56
1958
102,752.67
During the trial, respondent stated that he would not pursue one of the issues raised in the pleadings. We therefore conclude that he has abandoned it. The issues remaining for decision are: (1) Whether respondent erred in allocating, pursuant to sections 61 and 482, [2] to petitioners First Security Bank of Utah, N.A., and First Security Bank of Idaho, N.A., a portion of the income which First Security Life Insurance Company of Texas received from January 1, 1955, to December 31, 1959, for reinsuring credit life, health, and accident insurance, [3] or in the alternative, whether he erred in *6 allocating, pursuant to said sections, to petitioner First Security Company a portion of said income which First Security Life Insurance Company of Texas received from January 1, 1956, to December 31, 1959; and (2) whether respondent properly put section 482 in issue, and, if so, whether he should have the burden of proof. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner First Security Bank of Utah, N.A. (hereinafter referred to as Utah Bank), is a national bank incorporated in 1882. It filed its Federal income tax returns for the taxable years involved herein on a calendar year basis with the district director of *7 internal revenue, Salt Lake City, Utah. Its principal place of business was Salt Lake City, Utah, when it filed its petition in this case. Petitioner First Security Bank of Idaho, N.A. (hereinafter referred to as Idaho Bank), is a national bank, incorporated as such in 1941 after operating since 1865 as a state bank. It filed its Federal income tax returns for the taxable years involved herein on a calendar year basis with the district director of internal revenue, Boise, Idaho. Its principal place of business was Boise, Idaho, when it filed its petition in this case. Petitioner First Security Company (hereinafter referred to as Management Company) is a corporation organized under the laws of Utah in 1929. It filed its Federal income tax returns for the taxable years involved herein on a calendar year basis with the district director of internal revenue, Salt Lake City, Utah. Its principal place of business was Salt Lake City, Utah, when it filed its petition in this case. Petitioners are wholly-owned subsidiaries of the First Security Corporation (hereinafter referred to as Holding Company). It is the oldest bank holding company in existence. It is under the supervision and *8 control of, and is regularly examined by, the Federal Reserve System. It is qualified under and subject to the Bank Holding Company Act, 12 U.S.C. sections 1841 et seq. From 1954 through September 15, 1959, Holding Company had approximately 1,044,963 shares of common voting stock outstanding and from 2,000 to 3,000 shareholders residing in various states and foreign countries. Holding Company has had a policy of business expansion and acquisition throughout its existence. The banking offices of its subsidiaries extend from the Canadian border to the Arizona border. Moreover, it has entered into diversified enterprises other than banking. From 1954 to September 15, 1959, Holding Company had the following whollyowned subsidiaries, in addition to petitioners: (a) The First Security Life Insurance Company of Texas (hereinafter referred to as Security Life), a corporation organized and licensed as an insurance company pursuant to the laws of Texas. (b) Ed. D. Smith and Sons (hereinafter referred to as Smith), a Utah corporation. It had approximately twenty employees and sold life and casualty insurance. It had a yearly premium volume of approximately $800,000. *9 (c) First Security Insurance Agency, Inc. (hereinafter referred to as Agency), an Idaho corporation. It sold insurance and had a yearly premium volume of about $175,000. (d) Western Investment Corporation, an Idaho corporation holding various assets. (e) First Security State Bank, a Utah State bank. (f) First Security Bank, a Wyoming State bank. (g) Security Savings and Loan Association, a Utah State savings and loan association; and (h) First Security Savings and Loan Association, an Idaho State savings and loan association. On September 15, 1959, Holding Company underwent a reorganization pursuant to the Bank Holding Company Act, supra. The banking subsidiaries, including the three petitioners herein, were placed in a newly-organized bank holding company. The shareholders of Holding Company received the stock of the new bank holding company. The nonbanking subsidiaries, including Security Life, remained in the old holding company. [4]
*10 Utah Bank and Idaho Bank have numerous banking offices. Both are subject to supervision, inspection, and control by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Comptroller of the Currency and are regularly examined by them. The articles of incorporation of the banks limit them to the business of banking under the laws of the United States. Under the national banking laws, the members of the boards of directors of the banks are responsible for the proper operation of the banks. During the years in issue, Utah Bank had 141,000 to 192,000 depositors and $217,000,000 to $292,000,000 in deposits. During the same years, Idaho Bank had 113,000 to 131,000 depositors and $183,000,000 to $205,000,000 in deposits. Management Company provides accounting and other management services to the other subsidiaries of Holding Company. Management Company is subject to control, supervision, and inspection by the Board of Governors of the Federal Reserve System and is regularly examined by it. In 1948 Utah Bank and Idaho Bank began making available credit life, health, and accident insurance (hereinafter referred to as credit insurance) *11 [5] to their customers. They did this for several reasons, including (1) to offer a service increasingly supplied by competing financial institutions, (2) to obtain the benefits of the additional collateral which credit insurance provides by repaying loans upon the death, injury, or illness of the borrower, and (3) to provide an additional source of income - part of the premiums from the insurance - to Holding Company or its subsidiaries. From 1948 through 1952, Credit Life Insurance Company of Springfield, Ohio, wrote the credit insurance which Utah Bank and Idaho Bank had available for their customers. Credit Life Insurance Company and Smith entered into agency agreements designating Smith as Credit Life's agent in writing the insurance. Pursuant to the agreements, Credit Life paid commissions to Smith as follows: Amount of Payment to
Characterization of Pay-
Smith per Agency
ment in Agency
Period
Agreement
Agreement
9/24/48 through 6/ 1/50
40% to 50% of net premiums
Commissions
collected, based on volume
6/ 1/50 through 12/31/52
55% of premiums
45% commission,
10% expense reimbursement
*12 From January 1, 1953, through April 1, 1954, American Bankers Life Assurance Company of Florida wrote the credit insurance which Utah Bank and Idaho Bank had available for their customers. American Bankers Life Assurance Company and Smith entered into an agency agreement designating Smith as American Bankers' agent in writing the insurance. Pursuant to the agreement, American Bankers paid commissions to Smith of 55 percent of the net premiums collected on life insurance and 50 percent of the net premiums collected on health and accident insurance. Late in 1953, American National Insurance Company of Galveston, Texas (hereinafter referred to as National), [6] approached Holding Company with a plan whereby National would write the credit insurance which Utah Bank and Idaho Bank made available to their customers. The plan called for Holding Company to create a life insurance subsidiary. The subsidiary's business would be to reinsure the risks of the credit insurance policies written by National for the customers of the two Banks. Profits from the business could be retained in the subsidiary for investment. In its initial years, the subsidiary would utilize National's established and *13 experienced operating services - actuarial, accounting, etc. - on a fee basis. If the plan proved successful, the new insurance subsidiary could grow into a full-line, direct-writing insurance company. Holding Company was one of many financial institutions which National approached with such a plan. During 1953 National concluded that lending institutions would soon begin to form their own life insurance companies to write the credit insurance which they made available to their customers. They based their conclusion upon the facts that writing credit insurance was proving to be a very profitable business and that there were considerable tax savings on premium income. [7] This potential move by lending institutions would ultimately deprive National and other independent insurance companies of their credit insurance business. To salvage what it could from the situation, National decided to encourage lending institutions to develop their own life insurance companies by utilizing the operating services which National had developed for writing credit *14 insurance. By charging a fee for the services, National would recoup something from its investment in the credit insurance business. Holding Company decided to adopt National's plan. It did so for numerous reasons, including its policy of business expansion. To implement the decision, Holding Company incorporated Security Life in June 1954. Security Life was incorporated under the laws of Texas and approved by the Texas State Board of Insurance Commissioners. It had an initial capital of $25,000 [8] and an initial paid-in surplus of $12,500. [9]
National began writing credit insurance for the customers of Utah Bank and Idaho Bank in April 1954. The insurance was reinsured with Security Life under contracts called reinsurance treaties. Under the treaties National *15 received approximately 15 percent of the premium dollar for its managerial services and Security Life received the balance of the premium dollar for its assumption of 100 percent of the risk under the insurance policies. [10]
From April 1954 through 1959, National maintained Security Life's books and records and computed its required reserves. By purchasing the services of National, Holding Company effected considerable savings over what would have been the case had it attempted to launch a full-line, direct-writing company from the outset. It is a common practice to begin an insurance company by reinsuring risks and, if successful, grow into a full-line, direct-writing company. [11] There is no basic actuarial or business difference between an insurance company which reinsures and a direct-writing company. Utah Bank and Idaho Bank had a routine procedure for making credit insurance available to customers. A loan officer explained the availability and function of credit insurance to a customer.if the *16 customer desired the insurance, the loan officer gave him application forms. The customer then filed in the application. After examining the application, Bank personnel filed in a certificate of insurance and either collected the premium from the customer or added it to his loan. As the final step, Bank personnel forwarded the completed forms to Management Company for further handling. Utah Bank and Idaho Bank did not require customers to purchase credit insurance. During the years in issue, less than onehalf of the Banks' installment loan customers elected to take insurance and less than 13 percent of the Banks' real estate loan customers elected to take insurance. The cost to Utah Bank and Idaho Bank of processing the insurance was negligible. For the five years in issue, the total cost to Utah Bank was $8,929.30 and the total cost to Idaho Bank was $9,826.43. [12]
Management Company's role in processing the credit insurance was in the nature of bookkeeping. It had no contact with the public with respect to writing credit insurance. It received the forms, duplicate *17 certificates, and premiums from Utah Bank and Idaho Bank. It then made records of insurance purchased and forwarded premiums to National. It also did the paper work when claims had to be filed under the policies. The cost to Management Company of processing the insurance was negligible. For the five years in issue, the total cost was $10,150.34. [13] Idaho Bank, Utah Bank, and Management Company were not parties to the legal relationships and obligations of the insurance policies. National wrote the insurance and the Banks' customers were its policyholders. Under the terms of the policies, National was responsible for payment of claims. Under the reinsurance treaties, Security Life was obligated to reimburse National for claims it paid. Other than group policies, there were no contracts, agency agreements, or other legal connections between National and Idaho Bank, Utah Bank, or the employees of both. There were no contracts, agency agreements, or other legal connections between National and Management Company or its employees. From 1948 through 1959, the credit insurance which Idaho *18 Bank and Utah Bank made available to their customers was priced at the uniform rate of $1 per $100 coverage per year on a decreasing term basis. This was the rate commonly charged in the industry. It was accepted by the insurance commissioners of the states involved herein - Utah, Idaho, and Texas. During the years in issue, Security Life paid state and Federal taxes, used its own stationery, made deposits and withdrawals from bank accounts in its own name, and invested in its own name. Its sole source of business income was reinsurance premiums. Its business expenses were primarily bank charges, taxes, and claims settlement expenses. Security Life's credit insurance business was very profitable. Its yearly operations for the period 1955 through 1959 are reflected in the following table: Reinsurance
Premium
Claims and
National's
Received by
Claims
Net Profit to
Year
Net Premium [1]
Fee
Security Life
Expenses
Security Life
1955
$ 145,927.55
$ 24,765.65
$ 121,161.90
$ 45,340.38
$ 75,821.52
1956
277,437.45
43,695.72
233,741.73
97,609.66
136,132.07
1957
367,612.62
55,590.64
312,021.98
114,014.49
198,007.49
1958 [2]
647,874.90
62,954.22
584,920.68
118,874.46
466,046.22
1959
477,389.43
71,608.43
405,781.00
149,948.92
255,832.08
Total
$1,916,241.95
$258,614.66
$1,657,627.29
$525,787.91
$1,131,839.38
Less closing Life Reserve, 12/31/59
(110,806.00)
Less general expenses for period 1/1/55 through 12/31/55
(16,339.00)
TOTAL PROFIT
$1,004,694.38
*19 Security Life's operation for the years in issue are summarized in the following table in terms of percentages of total net premiums received. Percent of Total
Net Premiums
Item
Received
Fee paid to National
13.5
Claims paid
27.4
Life reserve on 12/31/59 and general
expenses
6.6
Balance
52.5
Total
100.00
Security Life's balance sheets for the period January 1, 1955, through December 31, 1959, are summarized in the following table: 1955
1956
1957
Assets
$161,370.52
$390,286.87
$648,586.43
Liabilities (including reserves)
$ 13,076.98
$ 22,295.00
$ 30,277.60
Capital
25,000.00
100,000.00
100,000.00
Surplus: Paid-in
12,500.00
12,500.00
12,500.00
Unassigned
35,099.41
Earned
110,793.54
220,392.46
505,808.83
$161,370.52
$390,286.87
$648,586.43
1958
1959
Assets
$1,204,424.45
$1,050,220.71
Liabilities (including reserves)
$ 271,479.06
$ 197,687.00
Capital
100,000.00
100,000.00
Surplus: Paid-in
12,500.00
12,500.00
Unassigned
Earned
820,445.39
740,033.71 [1]
$1,204,424.45
$1,050,220.71
*20 Although Security Life's business proved to be successful, there was no way to judge at the outset whether it would succeed. In relation to its capital structure, Security Life reinsured a large amount of risk. The following table shows the number of policies reinsured, the amount of risk it assumed, and the number of extra maximum claims which would have eliminated its surplus at the end of the year: No. of Extra
Maximum
Amount of
Claims which
No. of
Risk at
would have
Poli-
End of
Eliminated
Year
cies
Year
Surplus
1954
12,500
$ 6,483,000
3
1955
27,594
13,360,000
9
1956
34,388
21,105,000
28
1957
29,591
25,570,000
28
1958
32,155
36,761,000
50
1959
36,416
41,350,000
97
Furthermore, there were several aspects of Security Life's business which could have invited high mortality rates. Customers of the two Banks could obtain credit insurance without a health examination and there was no waiting period before the insurance went into effect. In addition, Security Life was a relatively small insurance company and its policyholders *21 lived in a relatively limited geographical area. Since Utah Bank and Idaho Bank began making available credit insurance to their customers in 1948, the officers of Holding Company and of the two Banks have held the belief that it would be contrary to Federal banking law for the two Banks to receive income resulting from their customers' purchase of credit insurance. They based the belief on the advice of legal counsel. Pursuant to the belief, the two Banks have never received or attempted to receive commissions or reinsurance premiums resulting from their customers' purchase of credit insurance. Petitioners Idaho Bank and Utah Bank reported no income from sales of credit insurance on their Federal income tax returns for the years 1955 through 1959. Petitioner Management Company reported no income from sales of credit insurance on its Federal income tax returns for the years 1956 through 1959. In his statutory notices of deficiency, respondent allocated to petitioners Utah Bank and Idaho Bank the reinsurance premiums received by Security Life from 1955 through 1959. He also, alternatively, allocated to petitioner Management Company the reinsurance premiums received by Security *22 Life from 1956 through 1959. [14] The pertinent explanatory material in each notice of deficiency is as follows: It is determined that the insurance premiums It is determined that the insurance [premiumss] and/or commission income reported as income by the First Security Life Insurance Company of Texas, a corporation, the stock of which is owned by The First Security Corporation, the same corporation which owns your stock, should have been reported by you. Therefore, your taxable income is increased as indicated for each of the taxable years 1955 [1956] through 1959. In a different case than the one at bar, respondent has asserted a deficiency against Security Life for the years 1955 through 1959. More than three years before the trial of the present case, *23 Security Life filed a sworn protest with the district director of internal revenue, Salt Lake City, Utah, contesting the asserted deficiency. Counsel for petitioners herein prepared Security Life's protest. To explain the difference between Security Life's case and the case at bar, the protest contains the following language: The issues involved are not at all related; each turns on its own set of facts and its own section of the Internal Revenue Code. The issue involved in the bank cases is whether the banks were the true earners of the income, and hence taxable under Section 482. The issue in this case is whether the reserves were established and maintained on an actuarial basis as required by Section 801(a). In the case at bar, respondent never filed any document prior to the pretrial conference formally notifying petitioners that he intended to rely on section 482. Two days prior to the trial herein, respondent filed a motion for a pretrial conference pursuant to Rule 28, Rules of Practice of the Tax Court. In the motion, respondent stated that he would rely on section 482 as well as section 61. Opinion The first issue is whether respondent has properly put section 482 *24 in issue. Petitioners argue that because respondent did not specifically mention section 482 in his notices of deficiency, and because he did not otherwise specifically and formally notify petitioners prior to the pretrial conference that he would rely on section 482, he is barred from relying on that section. Alternatively, petitioners argue that if we permit respondent to rely on section 482, he should bear the burden of proof because the determination with respect to the section 482 issue in the statutory notices does not contain sufficient legal and factual grounds. We do not agree with either argument. Petitioners' counsel knew three years in advance of the trial that respondent would rely on section 482. Moreover, petitioners do not allege surprise or suggest that they were prejudiced in any way by respondent's alleged omissions. It is clear from the record that petitioners' counsel were well prepared with an extensive and thorough case on the section 482 issue. In view of these circumstances, the cases which petitioners cite on this point are distinguishable. We hold that respondent has properly put section 482 in issue and that petitioners have the burden of proof. The *25 second issue is whether respondent erred in allocating, pursuant to sections 61 and 482, either to Utah Bank and Idaho Bank or to Management Company 40 percent of the net premiums which Security Life received during the years in issue for reinsuring credit insurance. In all essential respects, the facts of the case at bar are the same as those in Local Finance Corporation, 48 T.C. 773 (1967). Because of our decision in that case, most of petitioners' arguments on this issue are untenable. Petitioners do, however, make two arguments concerning the actuarial soundness of respondent's allocations which are not foreclosed by our earlier decision. [15]
Petitioners' main actuarial argument is based upon the testimony of their expert actuary. The crux of the testimony is the opinion contained in the following exchange: Q. What is your opinion? A. The size and nature of the risk assumed by this company [Security Life] in relationship to its capital structure required it to retain every dollar that it could possibly do so. Q. To stay on an actuarially sound basis? A. Yes. Petitioners' actuary based *26 his opinion upon the amount of risk which Security Life reinsured and upon factors in its insurance operation which might have invited high mortality rates. Petitioners claim that their actuarial evidence demonstrates that Security Life would have been actuarially unsound if it had paid an insurance commission to the Banks equal to what respondent now allocates to them. It follows, petitioners argue, that respondent's allocation pursuant to sections 61 and 482 is unreasonable. We do not agree. The central fact upon which petitioners' actuary based his testimony was Security Life's initial capital structure of $37,500. In the above-quoted passage he said that Security Life assumed great risk "in relationship to its capital structure." Respondent's actuary pointed out that Security Life's initial capitalization was unusually low for an insurance company. Petitioners' actuary corroborated this with the following testimony: Now, within the life insurance industry there is a very much used rule of thumb for new life insurance companies that is to establish it with capital and surplus of approximately 100 times its maximum risk on one life. This is arbitrary and a rule of thumb, *27 but it is also true that throughout the industry the amount that companies will retain on one life is closely in that neighborhood. The maximum risk on one life under the policies reinsured by Security Life was $5,000. Using the formula suggested by petitioners' actuary, Security Life's initial capitalization should have been $500,000, not $37,500. If its initial capitalization had been $500,000 rather than $37,500, petitioners' actuarial evidence would be meaningless. The validity of the evidence, in other words, hinges upon the fact that Security Life began business as an undercapitalized insurance company. This evidence does not persuade us that respondent's allocation pursuant to sections 61 and 482 is unreasonable. Petitioners make another actuarial argument based upon the fact that respondent, during trial and on brief, did not allocate to them Security Life's income from reinsuring risks on lines of insurance other than what we herein refer to as credit insurance. Petitioners contend that respondent ignored these lines because Security Life had a much higher claims experience with them than with credit insurance. Petitioners argue that this omission by respondent is a concession *28 that a 40 percent allocation on the other lines of insurance would be unreasonable. They conclude that what is unreasonable for the other lines of insurance is also unreasonable for credit insurance. We do not agree. Petitioners did not attempt to prove any business or actuarial similarities between Security Life's reinsurance of credit insurance and its reinsurance of other lines. It follows that we cannot draw inferences between the two lines. We do not decide that meaning, if any, attaches to the fact that respondent did not allocate Security Life's income from reinsuring the other lines of insurance. Neither of petitioners' actuarial arguments persuades us that respondent's allocation pursuant to sections 61 and 482 is unreasonable. The arguments do not, therefore, distinguish the present case from Local Finance Corporation, supra. It follows that we must uphold as reasonable respondent's allocation of part of Security Life's income. One problem remains - to which taxpayer should we allocate the income in question. Respondent, in his notices of deficiency, allocates the income either to Utah Bank and Idaho Bank or to Management Company. Petitioners argue that *29 the only taxpayers to which we can properly allocate the income are Smith and Agency, neither of which is a party herein. Their theory is based upon the facts that from 1948 through 1954 insurance commissions for the sale of credit insurance in the two Banks were payable to Smith and that during the years here in issue Smith and Agency held licenses to sell insurance. Because insurance commissions have never been payable to petitioners, and because none of the petitioners has ever held a license to sell insurance, they argue that it is logical to allocate the income to Smith and Agency, rather than to them. We do not agree. Petitioners performed services with regard to the sale of credit insurance during the years in issue. Smith and Agency did not. Therefore, it is not proper to allocate the income to Smith and Agency. See concurring opinion in Local Finance Corporation, supra, at 797. Among the petitioners, we allocate the income to Utah Bank and Idaho Bank. Our decision in Local Finance Corporation dictates this result. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: First Security Company, Docket No. 1191-63, and First Security Bank of Idaho, N.A., Docket No. 1216-63.↩
2. All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified. ↩
3. The statutory notice received by petitioner First Security Bank of Idaho, N.A., contained adjustments to certain net operating loss carrybacks. Because of these adjustments, this Court has jurisdiction under section 6214(b) to determine the correctness of respondent's allocations to this petitioner for the years 1956 and 1959.↩
4. Although the new holding company received the name of the old one - First Security Corporation - while the old one changed its name to First Security Investment Company, the term "Holding Company" will continue to refer to the pre-reorganization holding company.↩
5. For a description of the credit insurance industry, see Local Finance Corporation, 48 T.C. 773↩ (1967), at 776 et seq. 6. National is a leading nationwide insurance company. It is independent of and unrelated to Holding Company and its subsidiaries.↩
7. The Life Insurance Company Income Tax Act of 1959 in large part eliminated the tax savings. See generally Mertens, sec. 44A.01 et seq.↩
8. Security Life's capital was increased to $100,000 in 1956 through a $75,000 stock dividend. ↩
9. This was an unusually low capitalization with which to begin an insurance company. In 1954 Texas had low minimum capitalization requirements for incorporating insurance companies.↩
10. The maximum risk on one life under the the policies which Security Life reinsured was $5,000.↩
11. Security Life never developed into a fullline, direct-writing company.↩
12. These figures are derived from an extensive time-cost study prepared by an employee of Management Company.↩
13. This figure is derived from the time-cost study described in footnote 12, supra.↩
1. Gross premium less cancellations and adjustments. ↩
2. Includes 1958 reserve adjustment.↩
1. Security Life paid a dividend of $389,821.61 to Holding Company during 1959.↩
14. During the trial and on brief, respondent only urged the allocation of 40 percent of the net premiums which Security Life received from reinsuring credit insurance. He did not allocate any income which Security Life received for reinsuring risks on mortgage, twindollar, and borrow-by-check insurance, three types of insurance which Security Life reinsured in addition to what we refer to herein as credit insurance.↩
15. See Local Finance Corporation, supra, at 791↩.