James A. BASYE and Evelyn E. Basye, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Jack J. COOK and Carol L. Cook, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Maurice C. FISHLER and Phyllis H. Fishler, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Henry Donald GRANT and Jean H. Grant, Plaintiffs,

v.

UNITED STATES of America, Defendant.

William S. HUNTER and Jessamine S. Hunter, Plaintiffs,

v.

UNITED STATES of America, Defendant.

George W. SOROKOWSKI and Nadia Sorokowski, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 44352–44356, 45575.

United States District Court
N. D. California.

Nov. 29, 1968.

Stark, Simon & Sparrowe, by John F. Wells; Leonard Marcussen, John F. Banker, Oakland, Cal., for plaintiffs.

Cecil F. Poole, U. S. Atty., San Francisco, Cal., by John M. Youngquist, Asst. U. S. Atty., for defendant, United States.

### MEMORANDUM AND ORDER DIRECTING JUDGMENT FOR PLAINTIFFS

WOLLENBERG, District Judge.

These are consolidated actions for the refund of income taxes, and each one poses the identical problem which arises within the partnership provisions of the Internal Revenue Code. The facts have been stipulated to by the taxpayer petitioners and the respondent Commissioner of Internal Revenue. The petitioners are physicians who were each, during the years involved in their respective cases, general partners in a limited partnership of physicians organized in 1949 to practice medicine in California under the name of "The Permanente Medical Group" (hereinafter referred to as Permanente or as the partnership). This partnership used the accrual method of tax accounting in filing its partnership information returns. All partners used the cash method of accounting.

Prior to the years involved in these cases, Permanente contracted with Kaiser Foundation Health Plan, Inc. (hereafter referred to as Kaiser), a California nonprofit corporation, to provide medical services to members of Kaiser in its Northern California Region. Kaiser operates a contractual membership program providing pre-paid hospital and medical care to its dues paying members.

The contract provided that Kaiser would not only pay a basic compensation to Permanente for the medical services, but would also make payments toward a retirement plan when such a plan was approved by Kaiser. On or about December 30, 1958, such a plan (hereafter referred to as the Retirement Plan) was established to take effect as of July 1, 1959, by a trust agreement among Kaiser, Permanente, and the Bank of America National Trust and Savings Association, as trustee. In entering into both the original medical services contract and the trust agreement, Permanente and Kaiser were and remained independent organizations contracting at arms length.

The primary purpose of the trust agreement and the retirement plan is to create an incentive for physicians to remain with Permanente, or if they left Permanente, then to join some other group of physicians contracting to serve Kaiser members, thereby ensuring Kaiser that it would have a stable and reliable pool of physicians providing medical services to its members. To secure this purpose, the Retirement Plan contains the following provisions. A trust fund under the Bank of America trusteeship was established, and is to be supported by payments from Kaiser in partial compensation for the services of Permanente. Each physician who had served two years within Permanente, both those who were partners and those who were merely employees, was assigned a certain number of "units", which took into account such factors as the physician's salary from Permanente, his past service with Permanente, and the age at which he became associated with Permanente. Tentative accounts were then set up for each physician, and these accounts were credited with portions of the trust fund earnings (which included payments from Kaiser plus interest accrued on the corpus), with each account receiving credits in proportion to the units assigned to that particular physician. The accounts are tentative because the eventual enjoyment by any physician of his accrued share of the fund depends on several contingencies. If either a partner-participant or an employee-participant in the Retirement Plan terminates his affiliation with Permanente, for reasons other than his death or disability, prior to reaching age 65 or serving Permanente for fifteen continuous years, and if the participant does not thereupon join another medical group serving Kaiser subscribers, he forfeits the amounts allocated to his tentative account. And even upon his becoming eligible to receive retirement benefits from his tentative account, a participant may lose his right to these benefits if he renders professional services for a competitor of Kaiser, or if, while he is physically fit and legally entitled to practice medicine, he refuses to render consulting services to any medical group under contract with Kaiser, when reasonably requested to do so. Moreover, a "Retirement Committee", composed of representatives selected by both Kaiser and Permanente, is given the power to prescribe further conditions to the receipt of Retirement Plan benefits by participants.

The effect on each participant's rights in the trust fund in the event of a dissolution or reorganization of Permanente is of particular interest in the present case. The trust agreement provides that if, in the event of a dissolution or reorganization of Permanente, at least 50% of the combined total of practicing partner-participants and employee-participants become reassociated with a reorganized Permanente or with another group serving Kaiser subscribers, then the trust fund shall be kept intact and any unretired physician-participant who does not join in the new grouping shall forfeit his rights in the trust fund. The forfeiture will not occur in either of two circumstances. First, if in connection with Permanente's dissolution or reorganization, Kaiser and Permanente jointly agree to use the trust funds to support a new retirement plan which they believe will provide better retirement benefits for the participants, or will better effect the original purpose

of the trust agreement (viz., a reliable pool of doctors for Kaiser), then such a new retirement plan could provide that the accruals in the tentative accounts of all participants would be preserved. Second, if there is a dissolution or reorganization of Permanente without the above-mentioned 50% regrouping and without the creation of a new retirement plan by Permanente and Kaiser, then the assets held by the trust fund are to be liquidated and the proceeds distributed to all participants, retired and active, in lump sums prorated according to the tentative account balances.

The Commissioner of Internal Revenue determined that the partnership income returns filed by Permanente for its fiscal years ending June 30, 1960 through 1963 had understated income in omitting the sums of Kaiser's payments to the trust fund and the earnings on trust corpus. The Commissioner further determined that the increased partnership income was taxable to the partners for each calendar year in which the partnership fiscal year ended, and he assessed deficiencies in the individual income tax returns of each of the partners, including plaintiffs. In computing the deficiency for each partner, the Commissioner used the following formula. He calculated the total sum of payments attributable to the tentative accounts of *employee*-participants in the Retirement Plan, and he assessed each partner for these payments according to that partner's distributive share of general partnership income under the partnership articles.[1] He further assessed each partner for the annual increments in trust earnings attributable to that partner's own tentative account in the Retirement Plan, thereby treating the "unit" allocations under the trust agreement as a modification of the basic partnership agreement on the distribution of partnership earnings.[2]

■ It is this latter assessment which is contested here. Plaintiffs do not contend that they should never be taxed on the allocations to their tentative accounts, but rather that, in view of the many contingencies which condition their actual receipt of the proceeds represented in their accounts, the tax should be postponed until such actual receipt. The government prefers to tax the plaintiffs immediately, and to deal with subsequent forfeitures of rights to trust fund proceeds by allowing a loss deduction to a partner in the year of his forfeiture, and equivalent to the total tentative accruals forfeited. The remaining partners would then be taxed on the pro rata increases in their tentative accounts resulting from the liquidation of the forfeiting partner's account.[3]

The government and the plaintiffs have waged their battle on three separate legal fronts. For the reasons set out below, this Court finds that plaintiffs have prevailed in all three sectors.

## I

One ground upon which the government seeks to uphold its action is by analogizing the facts here to those in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. In that case the Supreme Court refused to allow a husband to es-

1. See Int.Rev.Code of 1954, § 704(b). The theory underlying this aspect of the assessment was probably that Health Plan by funding the retirement plan for the employee-physicians was saving Permanente from incurring the expense for such a project, and was therefore in effect supplying Permanente with additional income.

2. See Int.Rev.Code of 1954, § 704(a), and Reg. 1.761–(c).

3. One of the plaintiffs here, Dr. Nadia Sorokowski, terminated her membership in the partnership in 1963, thereby for-

feiting her rights to receive any payments from the trust. In 1966 the Commissioner on his own initiative, determined that Dr. Sorokowski was entitled to an ordinary loss deduction which would offset the assessment of trust income made against her, and the Commissioner made a further assessment against the remaining partners according to their pro rata tentative shares of Dr. Sorokowski's terminated account. Dr. Sorokowski has refused to accept the refund and stands with the other plaintiffs in contesting the Commissioner's deficiency assessments.

cape taxes on one-half of his income by having assigned one-half of it to his wife as a joint tenant. The Court declared that tax on a salary could not be avoided by the person earning the salary by anticipatory arrangements and contracts. The government here contends that it is the partnership which is earning the payments by Kaiser into the trust fund, and that, following Lucas v. Earl, the partnership (and hence the physician-partners *qua* partners) should not be allowed to escape immediate taxation through the assignment of the ultimate receipt of the payments to the partners *qua* individual trust fund participants. The government's contention has some persuasive force, but it ignores several lower court decisions which have persuasively refused to find Lucas v. Earl applicable in cases where a taxpayer confers the right to receive income upon another individual, but the taxpayer, while having earned the income, would never have had the right to himself receive it.[4] In Paul A. Teschner, 38 T.C. 1003, the taxpayer entered a contest in which the prize was an annuity policy to be used for college expenses. Only persons under seventeen were eligible to receive the prize, and any contest entrant over that age had to designate someone under seventeen to be the recipient. The taxpayer had designated his daughter as a recipient, and he won the contest. The tax court rebuffed the Commissioner's attempt to treat the prize as income of the taxpayer. In response to the Commissioner's assertion that "The basic rule in determining to whom an item of income is taxable is that income is taxable to the one who earns it  *  *  *", the Court replied:

> If by this statement the [Commissioner] means that income is in all events includible in the gross income of whomsoever generates or creates the income by virtue of his own effort, the respondent is wrong. If this were the law, agents, conduits, fiduciaries, and others in a similar capacity would be personally taxable on the proceeds of their efforts. The charity fundraiser would be taxable on sums contributed as the result of his efforts. The employee would be taxable on income generated for his employer by his efforts. Such results, completely at variance with every accepted concept of Federal income taxation, demonstrate the fallacy of the premise. 38 T.C. at 1007.

It must be noted that the Court reached its result despite the fact that the taxpayer's choice of a recipient relieved him of a later probable expense, that is, his daughter's college education. There is no evidence of such an effect in the present case.

Another case which is very much in point is Nicholas A. Stavroudis, 27 T.C. 583. The taxpayer was the beneficiary of a trust established in part with her own property and according to an agreement with the settlor. Under the terms of the trust, if the income from the trust property exceeded an amount necessary to make the taxpayer's total income for that year equal to $25,000, then one-third of such excess was to be paid to the tax-

---

4. In Commissioner of Internal Revenue v. Giannini, 129 F.2d 638 (9th Cir. 1942), the president of a bank refused without qualification his salary for the year 1927, offering a precatory suggestion that the money be used for some worthwhile purpose. The Commissioner argued, citing Lucas v. Earl, that "a taxpayer realizes 'income' when he directs the disposition thereof in a manner so that it reaches the objects of his bounty;  *  *  *." 129 F.2d at 640. The Ninth Circuit affirmed the decision of the Board of Tax Appeals that this money was not income to the taxpayer, because "the taxpayer did not receive the money, and  *  *  *  did not direct its disposition." 129 F.2d at 641. In deciding the instant case, one cannot derive sufficient precedential force from *Giannini* alone, because Permanente *did* direct, as a co-party to the trust agreement, the disposition of the payments by Kaiser. Yet it should be noted that the present case calls more for a distinction from Lucas v. Earl than did *Giannini*, as regards the matter of initial right to receive the income involved. The taxpayer in *Giannini* had that right; Permanente never did.

payer, and the taxpayer had the power to appoint the remaining two-thirds to such of the settlor's children as the taxpayer chose. If the taxpayer failed to dispose of this two-thirds excess within 30 days after the close of the year, the undisposed portion would be added to the principal of the trust property. On these facts, the tax court held that the two-thirds excess income from a given year was not taxable to the taxpayer. This holding was made despite the court's acknowledgment of the fact that it was within the taxpayer's power, by a failure to appoint the two-thirds excess to any of the children, to increase the trust corpus and thereby derive a benefit to herself through her one-third interest in excess trust income. While the court in *Stavroudis* limited its discussion to the separate Code provisions and caselaw dealing with the tax treatment of trust income, a principle analogous to that in Lucas v. Earl also applies in this area and guides judicial decisions, see Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055, and *Stavroudis* is thus instructive in the disposition of the instant case.

This Court concludes, in the light of the above cases, that Lucas v. Earl does not require characterization of the payments to the trust fund as income of the partnership, with a resulting justification of the immediate taxation of the partners on their tentative shares of these payments. Instead, one can examine the nature of the payments vis-a-vis the partners, as if they had directly bargained with Kaiser for these payments. Viewed in this manner, the payments do not justify an immediate tax upon the partners, because the eventual enjoyment of these payments is subject to the many contingencies established in the trust agreement. Arrangements similar to the Retirement Plan here have been held not to result in the realization of taxable income in the year in which employer contributions to a pension trust were

made, where the employee taxpayer accounted for his income, as do the petitioners here, on a cash receipts basis. See Julian Robertson, 6 T.C. 1060, acq., 1946—2 Cum.Bul. 4, and Harold G. Perkins, 8 T.C. 1051, acq., 1947—2 Cum. Bul. 3.

Even if petitioners used the accrual method for computing their taxable income, immediate taxation would not be justified.[5] The regulations of the Internal Revenue Service provide: "Generally, under the accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Reg. 1.446–1(c) (ii). As to the effect of contingencies in computing the income of an accrual method taxpayer, Mertens states: "Income does not accrue to a taxpayer until there arises in him a fixed and unconditional right to receive the amount * * *. If there are substantial contingencies as to the taxpayer's right to receive or uncertainty as to the amount he is to receive, an item of income should not be accrued until the contingency or events have occurred and fixed the fact and amount of the sum involved." 2 Mertens, Law of Federal Income Taxation § 12.60, p. 209.

In North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L. Ed. 1197, the Supreme Court rejected the notion that someone can be taxed on something which might never be received. In that case, the taxpayer was engaged in litigation over the ownership of certain income-producing property, and the income from the property for 1916 was held by a court-appointed receiver pending the outcome of the litigation, and paid to the taxpayer in 1917. The taxpayer contended that the income was realized in 1916, and accordingly reported the income on its 1916 return. The government, however, contended

---

5. A fortiori, what is contingent income for an accrual basis taxpayer would also be contingent for taxpayers, such as the petitioners, who employ the cash method of tax accounting.

that it was not realized until 1917, and the Court agreed:

> The net profits were not taxable to the company as income for 1916. For the company was not required in 1916 to report as income an amount which it might never receive [citations]. * * * [A]t no time during the year was there a right in the company to demand that the receiver pay over the money. * * * Nor is it material, for purposes of this case, whether the company's return was filed on the cash receipts and disbursements basis, or on the accrual basis. In neither event was it taxable in 1916 on income which it had not yet received and which it might never receive. 286 U.S. at 423, 52 S.Ct. at 615.

In Guarantee Title & Trust Co. v. C.I.R., 313 F.2d 225 (6th Cir., 1963), the taxpayer corporation was in the business of servicing mortgage debts, and it had a contract with a bank whereby it got a fixed periodic payment from the bank for its services on mortgages, with a possibility of additional payments if certain contingencies occurred, such as prepayment of the loans. These additional payments would be made to the taxpayer according to a schedule, and were designed to compensate it in cases where premature satisfaction of a debt relieved the bank of the need for the taxpayer's services. The taxpayer, which kept its books on an accrual basis, established a bookkeeping account in which it accrued the pro rata amount of additional payments which it would receive as per the schedule if and when a given debt was satisfied prematurely. The court held that the taxpayer needn't pay income tax on the amounts accrued in this account at the time of their accrual, because the eventual receipt of such amounts was too contingent. See also Etheridge and Vanneman, Inc. v. C.I.R., 40 T.C. 461.

Long Poultry Farms v. C.I.R., 249 F.2d 726 (4th Cir. 1957), dealt with the taxability of a member of a tax-exempt agricultural cooperative on reserves held by the cooperative. A certificate was issued to the member in an amount representing his share of these reserves. The government contended that the amount represented by the certificate should be included in the member's proportionate share of the cooperative's income for tax purposes. While the specific sum represented by the certificate was credited to the member's tentative account, the cash redemption of the certificate was subject to several conditions, such as the making of a profit by the cooperative, and it could not be sold. The court held that the member, who was on an accrual accounting basis, could not be taxed on the amount represented by the certificate.

> To require the inclusion in income of contingent credits such as are here involved, would be to require the [members] of cooperatives to pay tax upon income which they have not received, over which they have been given no control and which they may never receive. Apart from the question of constitutionality of such a requirement, which would be a serious one, it is a safe assumption that Congress never intended to impose * * * the hardship and burden which the taxability of these contingent credits would involve. 249 F.2d at 731.

## II

Even if Lucas v. Earl were flatly applied here so that the payments by Health Plan into the trust were regarded as being made to the partnership, a straightforward application of the long-standing principles regarding tax treatment of partnerships and partners would still require that we focus on the contingent nature of the rights which the individual partners have in the trust fund. The Code provisions dealing with partnership taxation call for application of what has come to be called the conduit approach. Section 702(b) provides:

> (b) Character of items constituting distributive share.—The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share [of partnership earnings] shall be determined as if

such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership.

In characterizing the nature of a partner's distributive share of partnership earnings under this approach, one must conceptually remove the partnership from the flow of the particular earnings, and imagine that a given partner as an individual will be the direct recipient of whatever earnings there are. From this viewpoint, one must ask what would be the taxable nature of the earnings in that partner's hands. See Senate Finance Committee Report, 3 U. S. Code Cong. & Admv. News, 83rd Cong., 2d Sess., p. 4722; 6 Mertens, Law of Federal Income Taxation, § 35.22, p. 63; and cf. Reg. 1.702–1(a) (8).

Applying the conduit approach to the present case, it is apparent that the cases dealing with the tax treatment of contingent earnings are once again applicable, and again the same result is reached with regard to the petitioners.[6]

### III

The government has attempted to support its actions here by focusing on the trust arrangement involved. The government first argues that since Kaiser can never get back any of its contributions, the trust lies irrevocably in favor of Permanente and therefore Permanente through the partners should be immediately taxed on all accretions. The argument ignores the fact that the trust lies in favor of the *participants,* which includes mere employees of the partnership, and that it is possible under the terms of the trust agreement for all partner-participants to forfeit their rights in the trust and leave only the employees as beneficiaries.

■ The government also argues that Permanente is a co-grantor of the trust and that Permanente through its partners had the power to revest title to the trust in itself and distribute the proceeds, so that the government's action is justified under § 676 of the Code[7] and Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916. But Permanente does not have this power. Under the trust agreement, if a majority of the present number of partners (e. g. 110 out of 200) decided to terminate their contract with Kaiser and to discontinue serving Kaiser members, they would forfeit their rights in the retirement plan if 50% or more of the *participants* (e. g. the remaining 90 partners and the 40 employee-doctors) chose to continue serving Kaiser members. While the agreement provides that the partnership may replace the present trust with a trust having different terms, Permanente cannot do this without the joint agreement of Kaiser.

The government seeks to impute a termination power to Permanente because Permanente selects four out of the seven members of the Retirement Committee established in the trust agreement. But the Committee's power is limited to establishing and enforcing conditions which retired participants must satisfy

---

6. An interesting question arises, however, as to whether two of the cases cited above, *Perkins* and *Robertson,* would be relevant under this second analysis which flatly applies Lucas v. Earl and regards the partnership as being the "recipient" of the payments. *Perkins* and *Robertson* involved taxpayers who used the cash method of accounting, and the courts in those cases deferred taxation on the basis of the constructive receipt doctrine. But when a partnership is present the rule is that a cash method partner must return his distributive share of income accruing to an accrual method partnership as that income accrues. Appeal of Truman, 3 B.T.A. 386 (1926), Truman v. United States, 4 F.Supp. 447 (N.D.Ill.1933). The other contingent earnings cases discussed above involved accrual method taxpayers and would therefore be applicable even under the conduit analysis.

7. Sec. 676. Power to revoke. (a) General Rule.—The grantor shall be treated as the owner of a trust, whether or not he is treated as such owner under any other provision of this part, where at any time the power to revest in the grantor title to such portion is exercisable by the grantor or a non-adverse party, or both.

in order to receive trust benefits, and also offering advice to the trustee on trust administration problems.

This Court thus concludes that the petitioners, and the other partners of Permanente, cannot be taxed now on the trust earnings attributed to their individual accounts, but that taxation must be postponed until the partner begins receiving benefits.

Accordingly judgment shall be for plaintiffs in each of the consolidated actions.

This opinion shall serve as findings of fact and conclusions of law in each of the consolidated actions under Rule 52(a). Plaintiff's counsel shall submit judgments in accordance with above memorandum opinion.