FIRST SECURITY BANK OF UTAH, N. A., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

FIRST SECURITY BANK OF IDAHO, N. A., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

FIRST SECURITY COMPANY, Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

Nos. 611-69, 612-69 and 613-69.

United States Court of Appeals, Tenth Circuit.

Jan. 21, 1971.

Stephen H. Anderson, Washington, D. C. (C. Preston Allen and Alonzo W. Watson, Jr., of Ray, Quinney & Nebeker, Salt Lake City, Utah, on the brief) for First Security Bank of Utah, N. A., and First Security Co.

John Brown, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., and Lee A. Jackson, Harry Baum and Stuart A. Smith, Attys., Dept. of Justice, on the brief) for Commissioner of Internal Revenue.

Before BREITENSTEIN and SETH, Circuit Judges, and TEMPLAR, District Judge.

BREITENSTEIN, Circuit Judge.

These consolidated appeals from the Tax Court relate to the allocation of income among taxpayers. No. 611-69 is an appeal by First Security Bank of Utah, N. A., (Utah Bank) from the decision that for the years 1955 to 1959 inclusive there is a deficiency in income taxes due from the taxpayer in the amount of $187,863.92. No. 612-69 is an appeal by First Security Bank of

Idaho, N. A., (Idaho Bank) from the holding that for the tax years 1955, 1957, and 1958 there is a deficiency of $210,-714.41. No. 613–69 is a protective appeal by the Commissioner of Internal Revenue from the decision that there are no deficiencies in the income taxes due from First Security Company (Management Company) for the years 1956 to 1959 inclusive. The Tax Court held that approximately 40% of credit insurance net premiums paid by borrowers from the two banks, and reported by another corporation, were allocable to income of the banks. Jurisdiction is conferred by 26 U.S.C. § 7482(a). Venue for the appeal of the Idaho Bank is in this court pursuant to a stipulation made under § 7482(b) (2). The findings of fact and opinion of the Tax Court are not officially reported but are found at 26 T.C.M. 1320.

The taxpayers are national banks. They and a Wyoming bank, Management Company, and certain non-banking affiliates were until 1959 wholly owned subsidiaries of First Security Corporation, a bank holding company which is publicly owned. During the years in issue Utah Bank had 141,000 to 192,000 depositors and $217,000,000 to $292,000,-000 in deposits and Idaho Bank had 113,-000 to 131,000 depositors and $183,000,-000 to $205,000,000 in deposits. Management Company provided accounting and other managerial services to subsidiaries of Holding Company.

Since 1948 the banks have made available to their borrowers credit life, health, and accident insurance which pays off the debt in case the borrower dies or is incapacitated during the term of his loan. The Tax Court found that they did this "for several reasons, including (1) to offer a service increasingly supplied by competing financial institutions, (2) to obtain the benefits of the additional collateral which credit insurance provides by repaying loans upon the death, injury, or illness of the borrower, and (3) to provide an additional source of income—part of the premiums for the insurance—to Holding Company or its subsidiaries." The premium charge for the credit insurance was at the uniform rate of $1.00 per $100.00 of coverage per year on a decreasing term basis. This was the rate commonly charged in the industry and was accepted by the insurance commissioners of the states involved—Utah, Idaho, and Texas. The banks did not require their borrowers to purchase credit insurance. During the taxable years less than 50% of their installment loan customers and less than 13% of their real estate loan customers elected to take insurance.

The banks had a routine procedure for making credit insurance available to customers. A loan officer explained the function and availability of the insurance. If the customer desired the insurance, the loan officer gave him the application forms for completion. Bank personnel examined the application, made out a certificate of insurance, and either collected the premium from the customer or added it to his loan. There is no showing that any of the bank personnel were licensed insurance agents. As the final step, bank employees forwarded the completed forms and premiums to Management Company for further handling. Management Company's role in processing the credit insurance was in the nature of bookkeeping. It had no contact with the public in respect to the writing of credit insurance. It received the forms, duplicate certificates, and premiums from the banks, made records of the insurance purchased, and forwarded the premiums to the insurance carrier. It also did the paper work when claims were filed under the policies.

The following items show pertinent facts with regard to the credit insurance which concerns us.

1. The number of policies written and the amount of risk at the end of each year, 1954 to 1959 inclusive, varied from a low of 12,500 and $6,483,000 respectively in 1954 to a high of 36,416 and $41,350,000 respectively in 1959.

2. The net premiums for the years 1955 to 1959 inclusive totalled $1,916,241.95.

3. The claims and claim expenses for the years 1955 to 1959 inclusive totalled $525,787.91.

4. For the years in issue the total cost to the Utah Bank for processing the insurance was $8,929.30, to the Idaho Bank $9,826.43, and to Management Company $10,150.34. The Tax Court described these costs as "negligible."

From 1948 to April 1, 1954, the credit insurance coverage on the banks' borrowers was carried first by Credit Life Insurance Company of Springfield, Ohio, and later by American Bankers Life Assurance Company of Florida, both of which were independent of Holding Company and its subsidiaries. Commissions varying from 40% to 55% of net premiums were paid to Ed. D. Smith & Sons which was an insurance agency and a wholly owned subsidiary of Holding Company.

American National Insurance Company of Galveston, Texas, an independent company, wrote a large volume of credit insurance. Foreseeing a change in the credit insurance business, National, late in 1953, approached Holding Company and other financial institutions with a plan whereby it would write credit insurance available to borrowers. The plan called for Holding Company to create a life insurance subsidiary. The subsidiary's business would be to reinsure the risks of the credit insurance policies written by National for the customers of Utah Bank and Idaho Bank. Profits from the business could be retained in the subsidiary for investment. In its initial years, the subsidiary would utilize National's established and experienced operating services, such as actuarial and accounting, on a fee basis. If the plan proved successful, the new subsidiary could grow into a full-line, direct-writing insurance company.

Holding Company adopted National's plan and in June, 1954, incorporated First Security Life Insurance Company of Texas under the laws of Texas with an initial capital of $25,000 and an initial paid-in surplus of $12,500. The credit insurance written by National for the two banks was reinsured with Security Life under contracts called reinsurance treaties. Thereunder National received approximately 15% of the premium dollar for its technical services and Security Life received the balance for its assumption of 100% of the risks under the policies. The maximum risk on one life under the policies reinsured by Security Life was $5,000.

In 1956, Security Life's capital was increased to $100,000. During the period it did not become a full-line, direct-writing insurance company. Although Security Life's business proved successful, this result was not assured at the outset. In relation to its capital structure Security Life reinsured a large amount of risk. As noted by the Tax Court, several aspects of its business could have invited high mortality rates. Customers of the banks obtained credit insurance without a health examination and without a waiting period. Also, Security Life was a relatively small insurance company and its policyholders lived in a relatively limited geographical area.

During the years in issue, Security Life paid state and federal taxes, used its own stationery, made deposits and withdrawals from bank accounts in its own name, and reinvested in its own name. Its sole source of business income was from reinsurance premiums. Its business expenses were primarily bank charges, taxes, and claims settlements. It paid a dividend to Holding Company of $389,821.61 in 1959.

On September 15, 1959, as a result of a reorganization pursuant to the 1956 act regulating bank holding companies, see 12 U.S.C. § 1841 et seq., the Utah and Idaho banks became owned by First Security Corporation, a publicly held corporation, and Security Life became owned by First Security Investment Company, also a publicly held corporation. The parties have stipulated that

as of February, 1967, there was a substantial difference in the ownership of the shares of the two companies.

On December 21, 1962, the Commissioner sent notices of deficiency to the taxpayers based on an allocation to the banks of approximately 47% of Security Life's premium income, during the years in issue, after payment of National's management fees. An alternative allocation was made to Management Company. On the authority of Local Finance Corporation v. Commissioner of Internal Revenue, 48 T.C. 773, affirmed, 7 Cir., 407 F.2d 629, cert. denied 396 U.S. 956, 90 S.Ct. 428, 24 L.Ed.2d 420, the Tax Court upheld Commissioner's allocation of income to the banks and denied his alternative allocation to Management Company. The banks have each appealed from the adverse decision on liability for tax deficiencies, and the Commissioner has taken a protective appeal from the conclusion of no deficiency due from Management Company.

Section 61 of the Internal Revenue Code of 1954, 26 U.S.C. § 61, defines gross income to mean all income from whatever source derived including, among specified items, "(1) Compensation for services, including fees, commissions, and similar items; (2) Gross income derived from business."

Section 482 of the Code, 26 U.S.C. § 482, covers allocations of income and deductions among taxpayers and provides that:

> "In any case of two or more organizations * * * owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, * * * if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, * * *."

In Likins-Foster Honolulu Corp. v. Commissioner of Internal Revenue, 10 Cir., 417 F.2d 285, 292, cert. denied 397 U.S. 987, 90 S.Ct. 1117, 25 L.Ed.2d 395, we recognized the purpose and effect of § 482, and the regulations thereunder, Treasury Regulations on Income Tax (1954), 26 C.F.R. § 1.482–1(b) and (c), provide that the standard to be applied in every case of a § 482 allocation "is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer" and that:

> "The authority to determine the true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer."

During the tax years in question Utah Bank, Idaho Bank, Management Company, and Security Life were all wholly owned subsidiaries of Holding Company and under its control. We are concerned with allocation of income from Security Life to the two banks. That income consists of a portion of Security Life's share of premiums paid by borrowers from the banks and received by Security Life under its reinsurance treaties. The test to be applied is whether the banks' income with respect to the borrowers' purchase of credit insurance was other than it would have been had the banks in the conduct of their affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Davis v. United States, 10 Cir., 282 F.2d 623, 626. Application of that test to the facts presented is not easy.

The two banks are national banks. Section 92, 12 U.S.C., authorizes national banks located in a place having a population not to exceed 5,000 inhabitants to act as an insurance agent. In 1963, an administrative ruling by the Comptroller of the Currency purportedly authorized every national bank, regardless of where located, to enter the insurance agency field. That ruling was nullified by Georgia Association of Independent In-

surance Agents, Inc. v. Saxon, N.D.Ga., 268 F.Supp. 236, affirmed 5 Cir., 399 F. 2d 1010, on the ground that, although § 92 does not explicitly prohibit banks in places with a population of over 5,000 from acting as insurance agents, it does so impliedly. In a different factual situation the Fourth Circuit held that a national bank is prohibited from operating an insurance department except in towns of less than 5,000 inhabitants. See Commissioner of Internal Revenue v. Morris Trust, 4 Cir., 367 F.2d 794, 795. We agree.

Section 93, 12 U.S.C., provides that for any violation of the chapter on national banks, the franchise of the banking association shall be forfeited and the directors individually shall be liable for damages sustained. The Tax Court found that because of the statutory provisions, and the advice of counsel relating thereto, the banks believed that it would be contrary to federal banking law to receive income resulting from their customers' purchase of credit insurance and they have never received commissions or reinsurance premiums arising from credit insurance transactions.

The Commissioner argues that the inhibitions of the banking laws do not preclude the operation of the tax laws. The banks concede the supremacy of the federal tax laws. Their position is that because of the prohibitions of the federal banking laws the banks have consciously remained aloof from any entitlement to income from the sale of insurance.

For the six years after the banks began offering credit insurance and before the formation of Security Life, the banks dealt exclusively with unrelated insurance companies in an uncontrolled situation. The Tax Court found that in the conduct of their affairs with these insurance companies the banks "never received or attempted to receive commissions or reinsurance premiums resulting from their customers' purchase of credit insurance." Conversely the Tax Court made no finding that if Security Life did not exist the banks would then receive or attempt to receive any such income. In an uncontrolled situation with arm's length dealing the banks, on the basis of the findings made, would not have taxable income from the credit insurance transactions.

When all the underbrush is cut away, the theory of the Commissioner appears as a claim that the generation of the credit insurance business by the banks sustains the allocation of a portion of the premium income to them. He relies on Local Finance Corporation v. Commissioner of Internal Revenue, supra. We turn to that decision.

Local Finance presents a fact situation quite comparable to that confronting us. Commonly owned Indiana small loan companies offered credit insurance to their borrowers and about 90% of those borrowers took the insurance at the rate of $1.00 per year per $100 of coverage. For a part of the period the insurer paid a guaranteed commission of 40% of the net premiums, plus certain extras, to an officer of the finance companies who, upon receipt, assigned the amount to the parent company. Later, a controlled life insurance company was organized and it reinsured the risks. Indiana law forbade finance companies from receiving any income other than interest on loans. Each finance office had a licensed insurance agent. The Commissioner allocated a portion of both the commission income and the reinsurance income to the parent. The rationale of the Tax Court opinion in Local Finance is not clear. We believe that dissenting Judge Fay's analysis is correct. He said, 48 T.C. 773 at 802:

"The majority opinion also relies upon section 482 for support in allocating the income to petitioners in order to clearly reflect income. The premise of this approach is the previously reached conclusion that petitioners have earned the income by the performance of various services and have exercised a power of disposition over this income to channel it to the reinsurance company."

In affirming the Tax Court, the Seventh Circuit said, 407 F.2d 629 at 632 and 633:

> "The Commissioner's allocation had the effect of compensating the finance companies for their efforts in generating and processing the life insurance.
>
> \*   \*   \*   \*   \*   \*
>
> However little the finance companies did to earn this money, they performed those minimal services which were the *sine qua non* of the insurance business."

The Commissioner now urges on us the generation of business theory. He says in his brief that "the effect of the Commissioner's allocation is to compensate Utah Bank and Idaho Bank for their efforts in generating and processing the credit insurance."

▇ Generation of income differs from assignment of income. It is fundamental that a taxpayer cannot assign a portion of his income in order to avoid tax liability on it. See Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731. Also the power to dispose of income is the equivalent of ownership. Helvering v. Horst, 311 U.S. 112, 118, 61 S.Ct. 144, 85 L.Ed. 75. These principles are grounded on rights in or flowing from income. See Poe v. Seaborn, 282 U.S. 101, 117, 51 S.Ct. 58, 75 L.Ed. 239.

The position of the Commissioner in effect is that whoever generates income must include the amount thereof in his gross income. The fallacy of this position was exposed by the Tax Court in Teschner v. Commissioner of Internal Revenue, 38 T.C. 1003, 1007, when it said:

> "If this were the law, agents, conduits, fiduciaries, and others in a similar capacity would be personally taxable on the proceeds of their efforts. The charity fund-raiser would be taxable on sums contributed as the result of his efforts. The employee would be taxable on income generated for his employer by his efforts. Such results, completely at variance with every accepted concept of Federal income taxa-

tion, demonstrate the fallacy of the premise."

See also Basye v. United States, N.D. Calif., 295 F.Supp. 1289, 1292–1295.

Indeed, the acceptance of the generation of business theory would have alarming consequences on normal commercial practices such as all types of referral business and security commission giveups. See Seieroe and Gerber, "Section 482—Still Growing at the Age of 50," 46 Taxes 893, 900–902 (Dec. 1968). We believe that in principle it runs contrary to all court and Tax Court decisions except Local Finance.

From the standpoint of principle the case at bar is indistinguishable from such cases as Nichols Loan Corporation of Terre Haute v. Commissioner of Internal Revenue, 21 T.C.M. 805, reversed on other grounds, 7 Cir., 321 F.2d 905 (deduction by small loan companies of expenses attributable to credit insurance); Campbell County State Bank, Inc., of Herreid, South Dakota v. Commissioner of Internal Revenue, 37 T.C. 430, reversed on other grounds, 8 Cir., 311 F.2d 374 (attribution of income and expenses of commonly owned insurance agency to bank); L. E. Shunk Latex Products, Inc. v. Commissioner of Internal Revenue, 18 T.C. 940 (allocation to manufacturer of part of income of controlled outlet when manufacturer was prohibited by maximum price regulations from receiving the income sought to be allocated); Jaeger Motor Car Company v. Commissioner of Internal Revenue, 17 T.C.M. 1098, 7 Cir., 284 F.2d 127, cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L. Ed.2d 823 (anticipatory transfer of insurance income from agent to controlled company); Moke Epstein, Inc. v. Commissioner of Internal Revenue, 29 T.C. 1005) insurance commissions received by president of taxpayer); and Ray Waits Motors, Inc. v. United States, E.D.S.Car., 145 F.Supp. 269 (insurance commissions received by president of taxpayer).

▇ Even though the credit insurance emanated from the banks in connection with their loan business, the result does

not follow that the banks should be taxed for income which they neither earned nor received. They did not earn it because (1) they were not licensed insurance agents, (2) they were impliedly prohibited by federal law from operating an insurance business, (3) their participation required minimal effort and negligible cost compatible with the added protection which they secured for loan payment, and (4) they had no underwriting risk. True it is that they physically received the premium payments but in so doing they acted only as a conduit to pass them on intact to others who were legally entitled thereto.

Consideration of §§ 61 and 482 separately or in tandem does not change the result. The § 61 cases such as Lucas v. Earl, supra, and Helvering v. Horst, supra, are not pertinent because the banks neither assigned nor otherwise disposed of income. They simply had no income from the credit insurance business. We are unwilling to extend those decisions to situations where the taxpayer had the power to channel profitable business.

The test for allocations under § 482 is arm's length dealing with an uncontrolled taxpayer. As the Tax Court recognized, in arm's length dealings with independent insurers before the organization of Security Life the banks did not receive income from credit insurance premiums. In our opinion the change to the reinsurance arrangement with National and Security Life did not change the situation so far as the income of the banks is concerned. They handled the business in the same way and were under the same inhibitions. The change in operations was for the benefit of Holding Company, not the banks.

We recognize the established rules that substance prevails over form, that the Commissioner has a wide discretion which we may not upset unless it is used arbitrarily or capriciously, and that the burden of persuasion lies on the taxpayers. These do not change the result. Generation of business is not enough to impose federal income tax liability. The effect of the action of the Commissioner and the decision of the Tax Court is to allocate approximately $800,000 in income to the banks and charge them with nearly $400,000 in tax deficiencies thereon. The banks have not received, and in all probability never can receive, the income because of the present diverse public ownership of the parent of the banks and the parent of Security Life. We believe that the § 482 allocations made by the Commissioner are arbitrary and capricious and inconsonant with the basic concepts of federal income taxation. To the extent that this opinion is inconsistent with that in Local Finance we respectfully disagree with that decision.

Because it upheld the Commissioner's allocations of income to the banks, the Tax Court rejected his alternative allocation to Management Company. Counsel for the Commissioner say that there is an adequate basis for the alternative allocation but we cannot answer that question on the record presented. It must be considered in the first instance by the Tax Court.

In Nos. 611–69 and 612–69 the judgments are severally reversed. In No. 613–69 the judgment is reversed and the case is remanded to the Tax Court for further consideration.